## PENNZOIL COMPANY, Plaintiff-Appellant,

### v.

**UNITED STATES DEPARTMENT OF ENERGY, Secretary James B. Edwards, and the United States of America, Defendants-Appellees,**

Exxon Corporation; Texas Independent Producers and Royalty Owners Association; Caldwell Schools, Inc., et al., Nancy Abernathy, et al., and O. B. Mobley, Jr., Amici Curiae.

### No. 3–27.

Temporary Emergency Court of Appeals.

Argued Nov. 13, 1981.

Decided April 6, 1982.

As Corrected April 22, 1982.

Rehearing Denied May 17, 1982.

John P. Mathis, Baker & Botts, Washington, D. C., with whom Randolph O. McManus, Washington, D. C., of the same firm; Perry O. Barber, Jr., James W. Shaddix and Jay G. Martin, Pennzoil Co., Houston, Tex., and Bruce M. Stargatt and Jack B. Jacobs, Wilmington, Del., of counsel, Young, Conaway, Stargatt & Taylor, Wilmington, Del., were on the brief for appellant.

Larry P. Ellsworth, Dept. of Energy, Washington, D. C., with whom Frank W. Krogh and Daniel F. Shea, Washington, D. C., of the same agency; Joseph J. Farnam, Jr., U. S. Atty. and Peggy L. Ableman, Asst. U. S. Atty., District of Del., Wilmington, Del., and George Kielman, Dean S. Cooper and Gilbert T. Renaut, Dept. of Energy, Office of Sp. Counsel, Washington, D. C., were on the brief for appellees.

David J. Beck, David L. Tolin and Ronald D. Secrest, Fulbright & Jaworski, Houston, Tex., David R. Johnson and John M. Simpson, Fulbright & Jaworski, Washington, D. C., and Barbara Finney, Exxon Corp., Houston, Tex., were on the brief for the Amicus Curiae, Exxon Corp.

Scott Anderson, TIPRO, Austin, Tex., and Joe A. Rudberg and James B. Harris, Thompson & Knight, Dallas, Tex., were on the brief for the Amicus Curiae, Texas Independent Producers & Royalty Owners Ass'n.

Leonard E. Davis and Michael E. Jones, Potter, Guinn, Minton, Roberts & Ireland, Tyler, Tex., were on the brief for Amicus Curiae, Caldwell Schools, Inc.

A. D. Clark, Jr., Tyler, Tex., Neal Hawthorn, Longview, Tex., and F. Lee Lawrence, Lawrence & Lawrence, Tyler, Tex., were on the brief for the Amici Curiae, Nancy Abernathy, et al.

John L. Schober, Jr., and Walter F. Clawson, Schober, Clawson & Brabham, Shreveport, La., were on the brief for Amicus Curiae, O. B. Mobley, Jr.

Before CHRISTENSEN, JAMESON and MAXWELL, Judges.

CHRISTENSEN, Judge.

This action was brought in the district court by Pennzoil Company against the Department of Energy (DOE) and its Secretary[1] to attack the validity of a 1975 ruling of the Federal Energy Administration as "retroactively" applied to the crude oil production of the unitized Walker Creek Field operated by Pennzoil in the State of Arkansas. From a summary judgment adverse to it, Pennzoil has appealed.

1. The United States was added as a party defendant upon motion of the other defendants so that a counterclaim could be interposed against Pennzoil for enforcement of the ruling challenged by plaintiff's action. The district court entered final judgment on plaintiff's claim, leaving the counterclaim for later disposition if the agency ruling should be sustained on appeal. We hereafter refer to "DOE" as the representative of the position of all named defendants in matters germane to this appeal and as successor of various predecessor agencies issuing or interpreting foundational regulations and the ruling in question.

The substantive problem presented here involves the regulatory definition of "property" in DOE's administration of the "two-tier" crude oil pricing system. Procedurally, the case presents an aspect of the "interpretation" vs. "rulemaking" problem not unfamiliar to this court. A simplified statement of the regulatory context may be helpful before we explore the labyrinth of regulations, affidavits, opinions, cases and arguments with which we are confronted.

Under federal price control regulations, ceiling prices for crude oil were determined during material times by comparison of historical and current levels of production from a given "property." "Property" was defined as "the right which arises from a lease or from a fee interest to produce crude petroleum." The quantity produced from a "property" in the designated base year was established as the "base production control level" (BPCL). Current production at or below the property's BPCL was deemed "old" oil, while production above a property's BPCL qualified as "new" oil. "Old" oil was subject to the lower-tier price and "new" oil together with a corresponding amount of "released" oil[2] warranted the higher price.

Again stated only conceptually to lend point to what follows, the two-tier oil pricing system required producers to report, on a property-by-property basis, the portion of their crude oil production that had to be sold at the lower-tier controlled price and the portion eligible for sale at the upper-tier or market price. These determinations were to be made by comparing each property's current monthly production with the property's historic 1972 production. When property was unitized[3] before 1972, the BPCL of this single "property" was the aggregate production of the constituent leases in 1972 to be compared to the total production of the leases within the unit in the current year. This application of the "property" concept is not questioned here.

The catch comes in this case when for the base year the properties were separate leases yet thereafter those leases were unitized so that the single unitized "right to produce" then became the "property." Absent unitization, if a lease which had production of a given amount in 1972, the base year, produced in a subsequent year an increased amount of oil, such increase would be counted as new oil free from old oil price constraints. However, if later it became, together with other leases, a part of a unit producing less oil than did the total of the constituent leases in 1972, the example lease may have produced more oil than in 1972, but no increased production of the unit as a whole would have occurred because of the reduced production of other leases constituting the unit.

If DOE is right, as the district court held, the 1972 base production control levels of the leases later designated a unit must be aggregated for comparison with the total

**2.** An earlier version of 10 C.F.R. § 212.74 entitled a producer to "release" a barrel of "old" at the "new" oil price for each barrel of "new" oil produced in a given month. See 39 Fed.Reg. 1924 (Jan. 15, 1974); 39 Fed.Reg. 31622 (Aug. 30, 1974); Energy Mgt. (CCH) ¶ 15,474.

**3.** The term is generally used to denominate the joint operation of all or substantially all of the separately owned producing tracts of a producing reservoir or an entire field which is undertaken after the field has been developed using primary production methods under non-unitized operations. "Unitization" is therefore to be distinguished from "Pooling," which describes the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules (generally the formation of a single-well "drilling" or "spacing" unit). See R. Langenkamp, Petroleum Reference Dictionary 182 (1980); Williams and Meyers, Oil and Gas Law (Abridged) § 901, at 593; Rocky Mountain Mineral Law Foundation, "Spacing, Pooling and Unitization," Landman's Legal Handbook 148, 158 (3d ed. 1977). Field-wide unitization represents a voluntary undertaking generally based on the agreement and approval of a substantial majority of the owners of operating interests and royalty interests in the field, and only following such concurrence may the state regulatory agency authorize unit operations and impose unitization on any minority of non-consenting interest owners. See, e.g., Ark.Stat.Ann. § 53–115C–2. The requisite percentage of approval ranges from 62.5 percent under some state statutes to as much as 85 percent under other statutes. Williams and Meyers, Oil and Gas Law (Abridged) § 913.5, at 604.

production from the unit during the critical periods in determining the quantity to be priced as new oil, if any; whereas if Pennzoil's contentions are accepted, any increased current production from one lease resulting from a reduction or elimination of production from another lease in the unit could have been properly sold at the higher price even though aggregate production from all of the leases forming the unit had been reduced from its 1972 level.

The district court in granting summary judgment in favor of DOE held [4] that *Grigsby v. Department of Energy*, 585 F.2d 1069 (Em.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979), was controlling against Pennzoil's position. This Pennzoil disputes as it presents these issues on appeal:

1. Whether *Grigsby v. DOE*, 585 F.2d 1069 (Em.App.1978), precluded the district court's examination of the record in determining whether the "property" and BPCL rules of 10 C.F.R. § 212.72 required aggregation of the 1972 BPCL's of individual "properties" included within a multiple-property, enhanced recovery unit formed after 1972, for purposes of calculating "new" and "released" oil.

2. Whether Section II–B of Ruling 1975–15 was validly promulgated insofar as it purported to require abandonment of 1972 "properties" and aggregation of their BPCL's upon formation of a post-1972 multiple-property, enhanced recovery unit?

Implicit in the latter issue is Pennzoil's contention that Ruling 1975–15 announced a new rule not previously inherent in or justified by the regulations which it purported to interpret. The briefs of amici curiae generally track appellant's contentions with variations which we shall address to the extent deemed significant on this appeal.[5]

### I. Proceedings and Decision in the District Court

In its amended complaint Pennzoil alleged that prior to field-wide unitization its Walker Creek Field consisted of wells drilled on each of 39 320-acre tracts, each tract being certified as a separate "property" and assigned a separate BPCL based on 1972 production, with the specific quantities of "old," "new," and "released" oil determined by measuring the current monthly production and sales against the BPCL of each tract for the corresponding month of 1972; that following creation of the Walker Creek Field Unit on May 1, 1974, and designation of Pennzoil as operator, production was reduced in the Unit to conserve reservoir energy and to lower gas production,

4. *Pennzoil Co. v. Department of Energy*, 514 F.Supp. 516 (D.Del.1981). *See also* 480 F.Supp. 1126 and 466 F.Supp. 238, reporting interlocutory rulings in the same case.

5. Exxon Corporation contends that *Grigsby* does not control the case, arguing, among other things, that the district court erroneously concluded that *Grigsby* requires all units created after 1972 to compute a unit BPCL under Ruling 1975–15; that there was error in not applying here the analysis of *Standard Oil Company v. DOE*, 596 F.2d 1029 (Em.App.1978); that to the extent *Grigsby* is applicable to a court granting summary judgment as in this case, that decision implicitly approves Pennzoil's interpretation of the property definition; and that the district court erred in failing to harmonize the "property" and "BPCL" definitions with the existence of the 1972 base period. The Texas Independent Producers & Royalty Owners Association argues that the district court erred in not applying the analysis of *Standard Oil*, and that to the extent *Grigsby* is applicable to a ruling on summary judgment it

implicitly approves Pennzoil's interpretation of the property definition. Caldwell Schools, Inc., et al., maintain that the ruling in question involves a change in meaning invalid by reason of its retroactive application and because it was not "required." The brief of Nancy Abernathy, et al., argues that the Ruling is arbitrary and capricious; that its retroactive application would upset the reasonable reliance of working interest and royalty owners upon the "plain meaning" of the property definition; that even though the meaning of the regulation was clear, the agency interpretation would have to be rejected because it was not "compelled"; and that *Grigsby* does not mandate that the Ruling be upheld as valid when applied to voluntary post-1972 unitization of multiple wells and multiple leases on a field-wide basis undertaken for purposes of enhanced or secondary recovery. O. B. Mobley, Jr., contends that the district court ignored "overwhelming evidence" in the record that Ruling 1975–15 is invalid under the *Standard Oil* doctrine.

and that injection operation began March 18, 1975; that "from May 1, 1974 through August 31, 1975, Pennzoil continued to calculate production from the Unit on a tract-by-tract basis, which had the effect of assigning BPCL's to each lease, for purposes of documenting and certifying volumes of 'old' and 'new oil'"; and that such treatment "was in keeping with the . . . definition of 'property' as adopted by the FEA, and was concurred in by FEA officials in conversations during the summer of 1974."

Pennzoil further alleged:

23. After the FEA issued Ruling 1975–15, Pennzoil, on September 1, 1975, adopted the "single property" approach to certifying production from the Unit, and a BPCL for the Unit based on 1972 production was established. As a consequence, from September 1, 1975 through January 31, 1976, no new oil was claimed from the Unit. Since Pennzoil concluded that Ruling 1975–15 was not applicable retroactively to the pre-September 1975 period, Pennzoil did not alter its prior certification of "old," "new," and "released" crude oil for the period May 1, 1974 through August 31, 1975. Had Pennzoil applied Ruling 1975–15, as originally issued, retroactively, no "new" or "released" crude oil would have been produced from the Unit from May 1, 1974 through August 31, 1975.

After several interlocutory rulings, extensive discovery, and briefing, the district court denied Pennzoil's motion for summary judgment and granted DOE's motion for summary judgment on plaintiff's amended complaint, expressly determining that there was no just reason for delay and ordering "that the clerk enter final judgment for defendants pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, on all claims raised by plaintiff in its amended complaint." The case is here on a timely appeal from this judgment.

The district court held, 514 F.Supp. at 517, that Ruling 1975–15 "effected no change in the pre-existing law" and thus was not a legislative rule representing a substantive policy choice requiring compliance with the notice and comment requirements of the Administrative Procedure Act and the Federal Energy Administration Act. Disposing of plaintiff's claims on the basis of *Grigsby*, Judge Stapleton observed that that case "would seem to foreclose anyone operating a unitized property from determining 'new oil' on the basis of a comparison between current production on individual leases subject to the unitization agreement or order and the 1972 production from those individual leases," and rejected Pennzoil's argument that, despite subsequent unitization, "property" boundaries were frozen as they existed in 1972.

The district court specifically addressed Pennzoil's argument that the holding in *Grigsby* had no application to units created after 1972, noting that there was nothing in TECA's analysis of Grigsby's position which would support the distinction Pennzoil sought to make. On the contrary, it pointed out the treatment accorded the Robert Leger Well No. 1 by the *Grigsby court*, 585 F.2d at 1069, and observed: "The recognition that 'rights to produce' can be created by unitization orders entered after 1972 is, of course, inconsistent with Pennzoil's argument that Section 212.72 froze 'property' boundaries as they existed in 1972." 514 F.Supp. at 518.

What Pennzoil contends, in essence, is that as to post-1972 unitizations the "aggregation" principle and other concepts of the Ruling were neither explicit nor essentially implicit in the definitional regulation; that the contemporary agency construction of that regulation furnished indications to the contrary on which it reasonably relied; or at least that informal contemporary agency opinion involved such conflicts or uncertainty as to warrant, or insulate from questioning by the agency, the actual pricing of Pennzoil's unitized production prior to the issuance of Ruling 1975–15; and that *Grigsby* far from being controlling to the contrary as the district court ruled, actually supports these views of Pennzoil.

II. *Regulatory Background*

In November 1973, when the Arab oil embargo had caused imported oil prices to

rise sharply, Congress passed the Emergency Petroleum Allocation Act of 1973 (EPAA), Pub.L.No.93–159, 87 Stat. 627 (codified at 15 U.S.C. §§ 751 et seq.). Regulations were to be promulgated under the EPAA within 15 days. A newly created Federal Energy Office (FEO) repromulgated the original Cost of Living Council (CLC) regulations with only minor changes, 10 C.F.R., Part 212, Subpart D, 39 Fed.Reg. 1952 (Jan. 15, 1974) where they remained until decontrol in 1981.[6]

A basic feature of the petroleum pricing regulations applied to domestic producers of crude oil was the "two-tier" pricing structure. 10 C.F.R. Part 212, Subpart D. The system was adopted to minimize the inflationary impact of worldwide oil prices and to provide an incentive for increased domestic production.[7]

When originally published in 1973 for public comment, the proposed regulations stated that amounts of old, new and released oil would have to be calculated for each "property" on which a producer of domestic crude oil "has leased" or "owns production rights." 38 Fed.Reg. 19182 (July 20, 1973). The term "property" was not then defined. Nine industry commenters specifically addressed the need for a definition. Most of these stated that a unit of oil leases would or should be a "property." None of the nine suggested that a unit should not be considered a separate

property. No one suggested that only certain types of units, or only units formed before a certain date, should be considered single properties. Pennzoil presented to the trial court affidavits and copies of correspondence indicating that in the mental processes of various officials concerned with the evaluation of comments and the suggesting or drafting of proposed definitions ranging all the way from those which would designate "property" on a firm-wide basis to those suggesting that "properties" would be the separate fee or lease interests producing oil; from this Pennzoil argues that it was contemplated that there would be lease-by-lease comparisons despite unitizations.

We have sought in vain for any reliable pre-adoption guides to a meaning of the definition in question other than is implicit in it. Explorations, recollections of past mental processes, fragmentary notations and discussions out of context with the present issue, opinions emphasizing in different settings one or the other of the twin objectives of the two-tier system (the control of prices and the stimulation of production), and the memories of a few former officials or employees of the agency, now affiliated with oil companies, of what they had in mind as they considered the problems of definition years ago can be accorded little if any weight in appraising the product of countless participants.[8] Moreover, to

**6.** The FEO was succeeded later in 1974 by the Federal Energy Administration (FEA) established pursuant to the Federal Energy Administration Act of 1974, Pub.L.No. 93–275, 88 Stat. 96 (codified at 15 U.S.C. §§ 761 et seq.), which agency continued to enforce the Mandatory Petroleum Price Regulations until DOE was established in 1977 pursuant to the Department of Energy Organization Act, 42 U.S.C. §§ 7101 et seq. On January 28, 1981, the President terminated petroleum price controls. Executive Order No. 12287, 46 Fed.Reg. 9909 (Jan. 30, 1981).

**7.** Our statement of the regulatory background need not repeat many of the details set out in prior decisions, however significant. The validity and other aspects of the system are discussed in Cities Service Co. v. F.E.A., 529 F.2d 1016 (Em.App.1975), cert. denied, 426 U.S. 927, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); Griffin v. United States, 537 F.2d 1130 (Em.App.), cert.

denied, 429 U.S. 419, 97 S.Ct. 313, 50 L.Ed.2d 286 (1976); Pasco, Inc. v. Federal Energy Administration, 525 F.2d 1391 (Em.App.1975); Consumers Union of U. S., Inc. v. Sawhill, 525 F.2d 1068 (Em.App.1975); and Nader v. Sawhill, 514 F.2d 1064 (Em.App.1975). Grigsby v. Department of Energy, supra, and Sauder v. Department of Energy, 648 F.2d 1341 (Em.App. 1981), relate more directly to the context in which the issues are now presented.

**8.** Documents "authored by agency staff or individual Commissioners 'cannot be considered as an official expression of the will and intent of the Commission.'" Securities & Exch. Comm'n v. National Student Mktg., 538 F.2d 404, 406–07 (D.C.Cir.1976), cert. denied, 429 U.S. 1073, 97 S.Ct. 809, 50 L.Ed.2d 790 (1977). "[W]e doubt" that an examination of staff memoranda "would give a very accurate picture" of the "ultimate decision" reached by the

dwell on these pre-regulation records or recollections would in a sense be anachronistic: most of those cited by Pennzoil were designed to explore the idea of lease-by-lease comparisons notwithstanding any unitizations, whenever occurring, a broad proposition from which even Pennzoil since has recoiled as we shall presently see, one which *Grigsby* since has concededly rejected, and one which has thus become even more clearly incompatible with the property definition itself, to which we now turn.

The CLC defined "property" as "the right which arises from a lease or from a fee interest to produce crude petroleum." 38 Fed.Reg. 22536, 22538 (Aug. 22, 1973) (formerly codified at 6 C.F.R. § 150.354(b)). That definition remained substantially unchanged until after the issuance of the ruling in question here.[9]

To determine amounts of old, new and released oil produced and sold from each property, the agency adopted the concept of a "base production control level" (BPCL). The BPCL was an historical figure—production during an earlier period of time—against which current production could be compared to determine the amounts of old, new and released oil. The BPCL was originally the amount of crude oil produced and sold during each corresponding month in 1972.[10]

On five occasions during 1974 and early 1975, the General Counsel of the Federal Energy Administration responded, pursuant to 10 C.F.R. §§ 205.80–.86, to requests from individual companies for formal agency Interpretations applying the "property" definition set forth in 10 C.F.R. § 212.72 in the

Commission. *Sterling Drug Inc. v. F.T.C.*, 450 F.2d 698, 706 (D.C.Cir.1971). The "interpretation given by an individual member of a Board or by its attorney is not, we think, to be taken as that official kind of interpretation to which courts must pay attention." *Marine Engineers' Beneficial Ass'n No. 13 v. NLRB*, 202 F.2d 546, 550 (3d Cir.), *cert. denied*, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953). It is "absurd" to rely upon the unsupported opinions of agency staff attorneys when trying to divine the meaning of a regulation. *Southern Goods Corp. v. Bowles*, 158 F.2d 587, 590 (4th Cir. 1946). *Cf. Montana Power Co. v. EPA*, 608 F.2d 334, 353 n. 36 (9th Cir. 1979) (although a memorandum circulated among conference committee members prior to passage of a bill "may be an accurate reflection of the senator's intent," it is "not probative of congressional intent," and therefore may not be considered in construing the statute). See text accompanying note 20 *infra*.

9. In 1974, the last word, "petroleum," was changed to "oil." 39 Fed.Reg. 31622 (Aug. 31, 1974); 10 C.F.R. § 212.72. In February 1976, the definition was restructured to read: "the right to produce domestic crude oil which arises from a lease or from a fee interest." 41 Fed.Reg. 4940 (Feb. 3, 1976); 10 C.F.R. § 212.-72.

In 1976, a provision was added to this property definition, effective September 1, 1976, to provide that:
[a] producer may treat as a separate property each separate and distinct producing reservoir subject to the same right to produce crude oil, provided that such reservoir is recognized by the appropriate governmental

regulatory authority as a producing formation that is separate and distinct from, and not in communication with, any other producing formation.
41 Fed.Reg. 36172, 36184 (Aug. 26, 1976).

10. The 1972 monthly production and sales BPCL was in the original CLC regulations at 6 C.F.R. § 150.34(b) and was repromulgated by the FEO in 10 C.F.R. § 212.72. Both were complex but each set out a formula of treating crude oil production as "new oil" to the extent that it exceeded the 1972 level of production of the "property" from which it was produced. *See Grigsby*, 585 F.2d at 1073. On February 1, 1976, the regulations were amended to eliminate the "released" oil provision and to give producers the option of using either 1972 monthly production and sales or 1975 "old" oil production for computing the BPCL. *Compare* 39 Fed.Reg. 1952 (Jan. 15, 1974) *with* 41 Fed. Reg. 4939 (Feb. 3, 1976). In 1979, the regulations were amended still further to give producers their choice of three BPCL's—1972 monthly production and sales, 1975 "old" oil, or "old" oil produced and sold from October 1, 1978 through March 31, 1979. 44 Fed.Reg. 22010 (Apr. 12, 1979). While Pennzoil seeks to make some point of the post-1975 regulatory changes, especially as throwing adverse light upon the validity of the 1975 ruling in question here, we have concluded that the validity of the changes is not in question on this appeal and that such changes were consistent rather than inconsistent with the validity, as distinguished from the question of the policy, of such ruling and its regulatory basis.

context of a unitization.[11] On each occasion, the General Counsel indicated that a multi-lease unit would be treated as a single property for purposes of calculating production from a given "property."

In the February 14, 1975 Interpretation issued to Shell Oil Company, FEA's General Counsel explained, in response to a request concerning a unit formed after 1972, that "all of the production from the leases in existence in 1972, which now are part of the newly formed unit, must be taken into account in determining the base production control level of the newly formed unit." 42 Fed.Reg. 23726 (May 18, 1977). In applying the property concept no distinction was drawn between units formed during or before 1972 and those formed afterwards.

On August 29, 1975, the agency issued Ruling[12] 1975–15. 40 Fed.Reg. 40832 (Sept. 4, 1975). It is this ruling that Pennzoil seeks to have declared invalid as applied to the previous production of the Walker Creek Field Unit.

In the introduction to this ruling, FEA emphasized the operative words of Section 212.72:

> For purposes of the price regulations then, the property concept is one that identifies the *right to produce crude oil*, whether that right arises from a lease or from a fee interest . . . . [I]t is necessary that the price regulations embody a uniform concept, the parameters of which can be readily applied to all domestic production, regardless of varying state classifications.
>
> . . . .
>
> II.  *Examples*
>
> A.  *Pre-1972 Unitization*—A property that was unitized prior to 1972 requires the same treatment as a single property

that has been unchanged since 1972. Often, where two or more leases have reached the declining stages of production, they are unitized (*i.e.*, the operations of the several leases are combined, more efficiently to undertake enhanced recovery techniques.) Such techniques usually involve the conversion of some previously producing wells to injection wells and/or the shutting-in of other wells in a coordinated overall-production effort, and for this reason some leases are left after unitization with fewer producing wells within their geographical boundaries than before. Unitization sometimes results in one or more leases being left only with injection wells, or with no operating wells at all. Because this realignment of producing patterns, then, may result in the distorted *actual* production from any one lease comprising the unit, production from the unit is allocated to each lease based upon *imputed* production percentages . . . . Generally, therefore, since the unit agreement signifies one right to produce crude oil arising from several leases or fee interests, the unit defines the property.

> . . . .
>
> B.  *Post-1972 Unitization*—In the case of a property that was unitized after calendar year 1972, the need for comparison of like quantities requires the producer in computing the BPCL to measure and total the individual 1972 monthly production levels for each of the leases that now comprise the unit. Accordingly, for example, where a unit consists of several leases that were unitized in 1973, the property consists of the unit, and the BPCL is the total 1972 monthly production from all of the several leases that

---

11.  These five Interpretations (officially numbered 1975–2, 1975–4, 1975–10, 1975–27 and 1974–22) were later published at 42 Fed.Reg. 23723, 23726, 23730, 23740 and 25659 (May 10 and 18, 1977).

> " 'Interpretation' means a written statement issued by the General Counsel or his delegate or Regional Counsel, in response to a written request, that applies the regulations, rulings, and other precedents previous-

ly issued, to the particular facts of a prospective or completed act or transaction." 10 C.F.R. § 205.2.

12.  " 'Ruling' means an official interpretative statement of general applicability issued by the DOE General Counsel and published in the *Federal Register* that applies the DOE regulations to a specific set of circumstances." 10 C.F.R. § 215.2.

now comprise the unit. Under no circumstances, therefore, would a post-1972 unitization create a "new" property, *i.e.*, one that has no BPCL.[13]

### III. *Pennzoil's Operation of the Walker Creek Field Unit Following Operation of Its Earlier Tinsley Units*

At the time the two-tier pricing system was adopted in 1973, the Walker Creek Field had not been unitized. Each well had produced oil during 1972 and a BPCL thus had been established for each tract. Pursuant to CLC regulations, the operators of each tract certified its BPCL to the purchasers of crude oil from the field.

Prior to 1972 Pennzoil also operated a number of units each composed of several crude oil leases in the Tinsley Field in the State of Mississippi. The company calculated a single unit BPCL for each Tinsley unit by totaling the production and sales from the constituent leases, thus treating the respective units as single properties within the contemplation of the price regulation. In January 1974, a Pennzoil official suggested a plan for increasing profits, despite declining production from the Tinsley units, by changing the method of calculating the BPCL's from a unit basis to a lease-by-lease basis. In an interoffice memorandum dated January 24, 1974, B. C. Sinclair, a petroleum engineer serving as Pennzoil's representative on the unit operator's committee and its chairman, stated:

> As Tom Dunn discussed with you, the position has been taken that for the purpose of determining if "new oil" has been produced from our waterflood projects in Tinsley, each field-wide unit is considered a "property" as the term "property" is defined by the Cost of Living Council price regulations. Since all of our waterfloods reached a peak production, when considered in total, prior to September, 1973, we have claimed no "new oil" from these projects.

> The CLC defines a "property" as follows—"Property is the right which arises from a lease or from a fee interest to produce domestic crude petroleum."

> Since the fieldwide units are the result of pooling many leases by several operators, it is my opinion that each lease could be considered a "property" in these fieldwide units. If we can so interpret the rules, we will be able to collect the "new oil" price on a significant volume of oil for the months of September thru December of 1973 and also in the future.

---

13. As heretofore noted, the regulatory history following the issuance of Ruling 1975–15, contrary to the contentions of appellant, does not throw into question the validity of that ruling as concerned previous production from unitized leases. It was for the agency in the first instance, both in its rulemaking and in its rulings consistent therewith, to appropriately balance the objectives enumerated in the EPAA and particularly to weigh in specific contexts the competing considerations of the constraint of inflation and the encouragement of increased production. To pursue that history in further detail would needlessly encumber this opinion. It should be noted, however, that on December 22, 1975, the Energy Policy and Conservation Act, Pub.L.No. 94–163, 89 Stat. 871 (codified in scattered sections of U.S.C.), was enacted expressly allowing the agency to permit increases in prices without current increases in production where the agency made findings that such increases would "give positive incentives for (i) enhanced recovery techniques." 15 U.S.C. § 757(b)(2)(A)–(C). Further agency investigation, comments and rulemaking culminated *inter alia* in regulations which created special provisions for units formed after the effective date of the regulations, including definitions of a unit and a unit BPCL, new rules concerning stripper well production and imputed new crude oil, and a provision that in the future the operators of units would not be required to implement a unit BPCL until there was a "significant alteration in production patterns." The agency explained in a preamble:

> Ruling 1975–15 is rescinded *ab initio* insofar as it requires producers of unitized properties to total all the BPCL's of the participating leases and to treat the unit as a single property, before such time as there has been a significant alteration in pre-unitized producing patterns of the individual leases. . . . Except as discussed above, Ruling 1975–15 is affirmed in all other respects.

41 Fed.Reg. 4937 (Feb. 3, 1976).

There is not now before us any issue concerning the application of this subsequent rulemaking and we refrain from expressing any opinion concerning it other than that it does not militate against our disposition of the issues presented to us on this appeal.

. . . .

Please check this with our attorneys and give us their ruling.

Memorandum from B. C. Sinclair to E. C. Shivers, Def. Ex. 25.

In another intra-company memorandum dated July 31, 1974, on the subject "Determination of 'New' Oil under Federal Energy Administration Mandatory Price Regulations for Walker Creek Unit," a Pennzoil official indicated that a decision on how to treat the Tinsley units would turn on the decision of how to treat the Walker Creek Unit. "If this all works out satisfactorily for Walker Creek we will try to get Jack Ohrt's OK to handle Tinsley in a similar manner." Def. Ex. 29.

The Walker Creek Unit was formally established effective May 1, 1974, with the approval of the State of Arkansas after the interest owners in 39 oil producing tracts agreed to combine their rights to produce so as "to increase the ultimate recovery" of oil from the field. Pennzoil, a thirteen percent working interest owner in the unit, became its sole operator. The decision to unitize the various leases had been made in December 1971, before oil prices had escalated to the point at which the CLC promulgated the petroleum price regulations. The final study concerning the Walker Creek unitization had been prepared by July 1973, again before the regulations were promulgated, and reflected that, with unitization, net profits would increase by $40.657 million because of the large amount of extra oil that could be extracted from the field even after taking into consideration the additional capital investment of $1.85 million associated with the enhanced recovery operations which were necessary to extend the producing life of the field. The projected increase in net profits over the lifetime of the unit was based on an anticipated price of $4.20 for each extra barrel of oil sold, which was less than the price of old oil at the time of unitization.

The Walker Creek Unit Agreement provided that "[a]ll Oil and Gas Rights . . . are hereby unitized . . . so that Unit Operations may be conducted with respect to the Unitized Formation as if the Unit Area had been included in a single lease." Each royalty and working interest owner was to receive his "fair share" of the unit's overall production, not the actual oil produced from his pre-unit tract.[14]

Immediately after the Walker Creek Unit was formed, at least 13 tracts—that is ⅓ of the unit's 39 tracts—were shut in while production from others was increased. Total monthly production from the unit was less, however, than had been the total monthly production from the 39 tracts prior to unitization. Had it calculated a unit BPCL upon unitization, the Walker Creek Unit would have produced only "old" oil, although total production over the life of the field would have increased. By treating each tract as a separate property with a separate BPCL and transferring production from some tracts to others, Pennzoil was able to create substantial volumes of "new" and "released" oil in the face of falling total monthly production.

In pricing the oil produced from the Walker Creek Unit during May 1974, the first month of unit production, Pennzoil, while not calculating a unit BPCL as it did for its Tinsley Units, attributed to the interest owners in each Walker Creek tract their "fair share" of the unit's production by comparing their collective imputed share of the unit's production as a whole with each tract's 1972 BPCL to establish amounts of old, new and released oil.

On June 14, 1974, Pennzoil wrote a letter to Cities Service Oil Company regarding pricing of oil from the Walker Creek Unit:

---

**14.** Specifically, the Unit Agreement provided that:

All Unitized Substances produced and saved . . . shall be allocated to the several Tracts in accordance with the respective Tract Participations effective during the period that the Unitized Substances . . . were produced. The amount of Unitized Substances allocated to each Tract, regardless of whether the amount is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract.

Please accept this letter as confirmation of our recent verbal request that you suspend bonus payments for oil purchased from the referenced unit until a determination can be made of the correct manner in which to calculate "new" and "released" oil.

We expect a ruling from the Federal Energy Office in the reasonably near future, and request that until further advice from us all payments be made at the applicable ceiling price, which is presently $5.20 per barrel.

Def. Ex. 33. No such ruling was ever requested or received by Pennzoil pursuant to 10 C.F.R. §§ 205.80–.86 (Sept. 5, 1974) or its predecessor 10 C.F.R. §§ 205.101–.103 (Jan. 15, 1974).

Pennzoil claims that before the unitization of the Walker Creek Field it had "guidance from FEO officials in Houston, Texas, regarding the proper method of pricing crude oil from the Field after unitization." The basis of this assertion is noted to be an intra-company memorandum which is dated April 18, 1974, reporting that an unidentified agency informant had advised a representative of the company that after post-1972 unitization "[a]ll certification as to New and Released Oil for wells which were producing from a lease will continue to be certified for that lease after unitization," but that "[a]ll production from units established prior to September, 1973 will have to be certified relative to the total production from that unit, rather than the lease upon which the wells were originally drilled." Pltf. Ex. 70.

Not long after the establishment of the Walker Creek Field Unit, a Washington, D.C. attorney wrote to a lawyer for Pennzoil:

This letter summarizes our conversation regarding those sections of the Mandatory Petroleum Price Regulations applicable to Producers of Crude Petroleum.

. . . .

On June 27, 1974 we spoke by telephone regarding the application of these provisions to the Walker Creek (Arkansas) Field. You explained that this field was unitized pursuant to an agreement which became effective May 1, 1974. Although the aggregate volume of production from this field may not have been materially changed with unitization, some wells have been shut in and production from other wells has been increased.

You asked whether the production increase over the May 15, 1973 volumes from those wells which had their capacity expanded was "new crude production" within the meaning of the Regulations.

After our initial conversation I spoke with James Langdon, Esquire, Director of the Office of Regulatory Review of the Federal Energy Office, about the unitized field situation . . . . He expressed the view that the appropriate method for determining what is "old" and what is "new" crude in a situation such as this is to compare the actual production from a given well or lease to the "base period" production of such well or lease. He explained that any increase over the "base period" production of such well or lease is "new" crude, provided that the unitization agreement does not collapse existing leases or property lines. He stated that our situation is not unique and that field unitization appears to create a "loophole" in the Regulations. He stated that this problem had been raised previously and is currently under consideration by the General Counsel's Office,[15] but he did not know of any imm[i]nent move to revise the Regulations or issue an interpretation that would alter his informal judgment.

At your request I am sending copies of this letter, for informational purposes only, to the lawyers for the Pennzoil Producing Company. . . .

Letter from Attorney Weidenfeld to Attorney Hardwick of Tulsa, Oklahoma, dated July 12, 1974, Pltf. Ex. 71.

---

**15.** The knowledge of Pennzoil at this time "that this problem had been raised previously" and was then "under consideration by the General Counsel's Office" seems both an invitation to seek advice from that source on its own particular problem and a warning that if it did not do so it was proceeding at its own peril.

On July 23, 1974, Mr. Sinclair, who as we have seen had already suggested a plan for increasing the Tinsley Unit "new" oil in spite of decreasing monthly unit production, received a memorandum in support of a similar but more pointed scheme for increasing Walker Creek Unit profits:

> Since it appears that certification of new and released oil for the Walker Creek Unit will be on the basis of actual rather than allocated well production, an attempt should be made to produce only new and released oil. This will mean, for the most part, that production rates for most of the wells will have to be increased to in excess of 640 barrels per day.
>
> . . . .
>
> Production at high rates does not appear to present a gas balancing problem; however, tankage availability is definitely a problem. Considering the additional income to be generated by producing only new and released oil, tanks from some of the shut-in wells could be temporarily moved to the high volume wells.

Interoffice memorandum from James A. Crews to B. C. Sinclair, DOE Br., Addendum 4; *see also* Pennzoil's Reply Br., Addendum at A–3 to A–4.

From August 1974 until Ruling 1975–15 was issued in August, 1975, Pennzoil certified the Walker Creek oil by comparing actual production from each tract against that tract's separate BPCL. Beginning in September, 1975, because of Ruling 1975–15, Pennzoil calculated amounts of old, new and released oil from Walker Creek by using a unit BPCL.

At the present time Pennzoil concedes that the aggregation principle controls at least pre-1972 units, as indeed it must in view of the wording of the definition, and *Grigsby.* The validity of its present position depends upon differentiating the application of the unit concept to units created after 1972. Its initial attack upon the Ruling before the agency, as well as its original position in the district court, was against the "unit as property" concept as a whole. Thus in an "Application for Rescission of Ruling 1975–15 or for Proposed Rulemaking" submitted to the agency by Pennzoil's vice-president and general attorney under date of November 14, 1975, it was stated:

> Pennzoil submits that treating each lease or tract separately as a "property" is consistent with the current regulations and furthers the basic goals of the Emergency Petroleum Allocation Act. The present ruling serves as a significant deterrent to the formation of new units and threatens the economic existence of present units which have been maintained on the expectation that some portion of their production would qualify for new oil prices. Since Ruling 1975–15 is an illegally adopted amendment to the regulations and represents an ill-conceived policy as well, Pennzoil requests that it be revoked.

R. 2282.

Pennzoil concluded in summary that the FEA should implement one of the following approaches which it listed in the order of its preference:

> 1. Rescind Ruling 1975–15 and treat each tract or lease within a unit created for enhanced recovery as a separate and distinct "property" for purposes of computing the BPCL as presently required by the regulations.
>
> 2. Adopt by rulemaking a new policy which (a) treats all units created for enhanced recovery as "new" properties, or (b) eliminates the year 1972 as the base year for computing the BPCL and substitutes the period which immediately precedes the date operations for enhanced recovery commence.

R. 2285–86.

On May 2, 1978 this court decided *Grigsby.*

IV. *The Principle of Ruling 1975–15 Is Implicit in the Property Definition*

No one has claimed that there was any flaw in the rulemaking encompassing the property definition nor that if the principle of Ruling 1975–15 had been explicitly set out in that rulemaking Pennzoil's contentions here would not have to be rejected,

wholly apart from any controlling effect of our decision in *Grigsby*.[16]

The most significant institutional interpretations bearing on the issues of this case are, of course, the pre-ruling official Interpretations by the General Counsel of the agency heretofore referred to, Ruling 1975–15, and the definitional regulation itself, which officially spoke for the agency from the beginning.

The statement of the definition that "property means the right which arises from a lease or fee interest to produce crude petroleum" is obviously quite different in meaning than if the regulation had provided that "property means a lease or fee interest producing crude oil." As *Grigsby* points out, "[t]he focus of the 'property' definition is upon the 'right to produce,' not the fee or leasehold nature of the ownership interest." 585 F.2d at 1083.

■ The application of this definition to unitized properties plainly contemplates a single "property" or right to produce arising from the several leases or fee interests constituting the unit. The very concept of unitization in general, and the express terms of the unit agreement covering the Walker Creek Field in particular are in accord.

To support Pennzoil's present contention would require a revision of the definition to read essentially: " 'Property' means the right to produce domestic crude oil which arises from a lease or from a fee interest unless a lease or fee interest which had production in 1972 is included in an enhanced recovery unit after 1972, in which latter event each individual lease is the 'property' for the purposes both of determining BPCL's and measuring current production." Yet if upon unitization the "property" is no longer defined by each individual lease but by the unit as a single right to produce, it seems rather obvious that current production of the "property" after unitization must include all production from all of the leases within the unit.

■ But Pennzoil protests that if this is done for post-1972 unitizations, there will have been no corresponding unit in 1972 whose base production could be compared with current production. Its solution is to pretend for pricing purposes that there has been no unitization into a single right to produce so that current production can continue to be compared lease by lease with 1972 production. We do not think it makes sense either to thus suppose the existence in 1972 of a unit which did not then exist, or to pretend that there did not exist in a later year a unit which then did exist. We believe that the concept of the property definition in the context of the case now presented to us requires production of the unit as a whole as it existed in the current year of measurement to be compared with the combined BPCL's of the leases comprising that unit as they existed in 1972 prior to unitization.

The case before us involves a regulation doing much more than "pointing in the direction"[17] of the interpretation later issued by the administrative agency. Inherent in that regulation was the property concept, thus furnishing a meaningful guide for applying the definition to the unit in question, whatever may be thought of its application in other contexts. We are not here concerned with post-1975 alterations of production patterns, production from differ-

---

**16.** Mr. Mathis (for Pennzoil): So our primary contention is that Ruling 75–15 is a legislative-type a [sic] change in the regulations and, therefore, should have been proceeded [sic] by notice and opportunity to comment as required by the Administrative Procedure Act.

    The Court: All right.

    Mr. Mathis: The second—

    The Court: Before you go on to the second, what you challenge about 75–15 is the requirement that there be an aggregation.

    Mr. Mathis: Yes, sir.

    The Court: You did not challenge the authority of the Agency if they have power to say there has to be an aggregation. You don't challenge their authority to say [later] you don't have to aggregate until you have a significant alteration of production pattern.

    Mr. Mathis: We do not; that is correct. R. 0087–88.

**17.** *Cf. State of La. v. Department of Energy*, 507 F.Supp. 1365, 1376 (W.D.La.1981).

ent reservoirs on the same lease, post-1972 subdivisions, farmout agreements or the treatment of reservoir-wide production units under rulings after 1975, to which attention has been diverted in the arguments. Time enough for us to address these different problems in their own contexts if and when they are presented to this court.[18]

The two-tier pricing system was designed to effectively minimize the inflationary impact of rising worldwide oil prices and provide necessary incentives for increased domestic production. *Cities Service*, 529 F.2d at 1020. Pennzoil's reading of the definition would disregard the agency's primary responsibility of balancing objectives and ignore its duty to reasonably inhibit gerrymandering of boundaries undertaken to avoid price controls. The views of CLC officials cited by the company in support of its own construction that the enhancement of production had to be the dominant objective can alter neither the plain language of the definition nor its application to Pennzoil's present operation as determined by the agency entrusted by Congress to balance multiple objectives in the administration of relevant statutes.

But because of Pennzoil's earnest insistence upon its own ideas as to the primacy of objectives, and its rather cavalier rejection of the agency's interpretations in misplaced reliance upon our decision in *Standard Oil*, it may be helpful to recapitulate the basic rules affecting the weight to be accorded to administrative interpretation before we address the determinative differences between the situation in *Standard Oil* and the present case.

In *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945), the Supreme Court stated that in interpreting an

administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. The intention of Congress or the principles of the Constitution in some situations may be relevant in the first instance in choosing between various constructions. But the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.

We have stated that "[i]nterpretative rules ... are not binding on the courts," whereas a "legislative rule has the force of law." *Energy Consumers, Etc. v. Dept. of Energy*, 632 F.2d 129, 140 (Em.App.), *cert. denied*, 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980); *Standard Oil*, 596 F.2d at 1061.

As Professor Davis has observed:

When a rule is issued pursuant to delegated power, the court is bound by it as if it were a statute, and the court can do no more than inquire into its validity. But when a rule is not issued pursuant to delegated power, the court's inquiry is not into validity but is into correctness or propriety....

2 *Davis, Administrative Law Treatise* § 7:13, at 59 (2d ed. 1979) [hereinafter cited as *Davis*].

When an agency has power to make a legislative rule, a rule it issues may still be an interpretative rule if it so intends, and courts do the best they can to discover the intent. When a rule purports to change the law, it cannot be merely interpretative.

*Id.* § 7:8, at 42–43.

Professor Davis distinguishes between legislative rules and interpretative rules as follows:

The Supreme Court stated that other matters "are not in issue in this case and statements interpreting that amendment have no bearing here." The Court added: "The Administrator's explanation of these amendments, which are not presently before us, is likewise irrelevant in this case."

---

18. *See Bowles v. Seminole Rock Co.*, 325 U.S. 410, 418 n.9, 65 S.Ct. 1215, 1219 n.9, 89 L.Ed. 1700 (1945), dealing with a situation where there allegedly had been an inconsistent administrative interpretation of an amended regulation and in which the Court was not dissuaded from following the challenged interpretation.

The crucial difference between the interpretative rules dealt with in the Skidmore case [*Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)] and the legislative rules dealt with in the A.T. & T. case [*American Telephone & Telegraph Co. v. United States*, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936)] is that the ultimate power to determine the content of the law covered by the rules was in the courts in the Skidmore case and in the FCC in the A.T. & T. case. And the reason for the result in each instance was that Congress withheld general lawmaking power from the Administrator in the Fair Labor Standards Act but granted the lawmaking power to the FCC in the Communications Act.

*Davis*, § 7:10, at 51–52.

In *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), the Supreme Court stated:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136. See also, *e.g., Gray v. Powell*, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; *Universal Battery Co. v. United States*, 281 U.S. 580, 583, 50 S.Ct. 422, 423, 74 L.Ed. 1051. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' " *Power Reactor Co. v. Electricians*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924. When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.

Earlier, in *Skidmore*, 323 U.S. at 140, 65 S.Ct. at 164, the Supreme Court had declared that the deference accorded an interpretative rule in a given case "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." [19]

In the administration of the statute involved in *Skidmore*, "Congress did not utilize the services of an administrative agency to find facts and to determine in the first instance whether particular cases fall within or without the Act. Instead, it put this responsibility on the courts." *Skidmore*, 323 U.S. at 137, 65 S.Ct. at 163, citing *Kirschbaum Co. v. Walling*, 316 U.S. 517, 523, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638 (1942). The Supreme Court has demonstrated a willingness to grant more deference in situations similar to that involving the DOE under the ESA and the EPAA where Congress established the agency as a regulator and interpreter in the first instance rather than "[putting] upon the courts the independent responsibility of applying *ad hoc* the general terms of the statute to an infinite variety of complicated industrial situations." *Kirschbaum*, 316 U.S. at 523, 62 S.Ct. at 1120.

By reason of our determination that the controlling concept of Ruling 1975–15 was implicit in the regulatory definition of "property," we need not here decide the extent of the special deference to be afforded the interpretation in view of the distinction thus drawn by the Supreme Court and noted by Professor Davis; we would sustain

---

**19.** *See Standard Oil*, 596 F.2d at 1056, stating the *Skidmore* rule but where a distinction based upon the varying powers of agencies was not critical in view of the circumstances heretofore referred to.

that interpretation on the basis of the criteria for deference outlined in *Skidmore*. Yet the broad agency authority with which we are concerned in the present case lends further support to our conclusion.

██ With further reference to Pennzoil's reliance upon informal advice as a diminishment of deference to be accorded to the agency's ruling, it is worth remembering that opinions are to be given little weight, as such, unless they are institutional in character. Thus in *Mobil Oil Corp. v. Tully*, 653 F.2d 497, 501–02 (Em.App.1981), *vacated on other grounds*, —— U.S. ——, 102 S.Ct. 1047, 71 L.Ed.2d 120 (1982), this court held that an informal letter not constituting an official agency interpretation "is of little value." *Cf. McCulloch Gas Processing v. Dept. of Energy*, 650 F.2d 1216, 1229 (Em. App.1981). Although the recent case of *United States v. LaSalle National Bank*, 437 U.S. 298, 313–17, 98 S.Ct. 2357, 2366, 57 L.Ed.2d 221 (1978), was in different context, it is instructive to note the similar distinction there drawn between institutional action and employee comments and opinions.[20]

Before the promulgation of Ruling 1975–15, the Office of the General Counsel issued five Interpretations of the definition. Each treated a multi-lease unit in harmony with the "single-property"[21] concept, and at least one rejected a different concept with reference to a post-1972 unitization.

The only official statements cited by Pennzoil which may be said to throw question upon this concept are two FEA Office of Exceptions and Appeals (OEA) exception decisions issued prior to Rule 1975–15.[22] It is obvious in view of the dates of these decisions that they could have had no influence upon the plan to unitize the Walker Creek leases nor upon the unit's pricing practices. The purpose of an exception decision is to decide whether an applicant should be relieved, because of some "serious hardship or gross inequity," from a duty which it believes otherwise would be required by a regulation. *See* 42 U.S.C. § 7194; 10 C.F.R. §§ 205.50 *et seq.* Consequently, the agency's primary responsibility in exception proceedings is to determine whether a producer should be allowed to do what a regulation may preclude. Pennzoil, moreover, ignores three other exception decisions issued between 1974 and the time of the Ruling and all having "single-property" language unfavorable to its position.[23] A careful reading of even the two exception

---

**20.** See cases cited in note 8 *supra*.

**21.** See note 11 *supra* and accompanying text. Pennzoil suggests that these interpretations should be ignored because they were not published in the Federal Register until March 1977.

 The fact is that these five Interpretations, issued to different companies prior to the issuance of Ruling 1975–15, belie Pennzoil's argument that Ruling 1975–15 was the first time the agency ever announced an institutional position that a unit is a property.

**22.** Sun Oil Co., 2 FEA ¶ 83,075 (Mar. 21, 1975), and Empire Drilling Co., 2 FEA ¶ 83,142 (May 9, 1975), *aff'd*, 2 FEA ¶ 80,676 (Sept. 2, 1975). Pennzoil also points to the Secretary of Energy's brief filed with the Federal Energy Regulatory Commission (FERC) in support of a remedial order then under review in North American Production Co., Energy Mgt. (CCH) ¶ 46,080 (July 18, 1980). Pennzoil Br. at 20 n.60. It seems likely that Pennzoil's references to that brief are taken out of context. That case concerned only the part of the Ruling concerning subdivision of leases, which is not in issue here.

 Nonetheless, FERC, which is the last step in the DOE review process for remedial orders, rejected the Secretary's position in that case and reaffirmed the central focus of the property definition on the "right to produce." Exxon and other amici point to a statement concerning "vagueness" of the property definition made by FEA Deputy Administrator John A. Hill before a committee of Congress in November 1976. There is no indication that this statement had reference to the application of the property concept to the uncomplicated problem of the Walker Creek Unit. In any event, such statements carry little weight. *See United States v. Stewart*, 311 U.S. 60, 70 n.22, 61 S.Ct. 102, 108 n.22, 85 L.Ed. 40 (1940).

**23.** In these three pre-Ruling 1975–15 exception decisions the agency assumed, along with the producers in those cases, that a unit was a single property. Pruet & Hughes Co., 2 FEA ¶ 83,270 (Aug. 25, 1975); D. L. Withington, 2 FEA ¶ 83,079 (Mar. 26, 1975), *aff'd*, 2 FEA ¶ 80,608 (June 13, 1975); M. J. Mitchell, 1 FEA ¶ 20,611 (June 3, 1974).

decisions relied on by Pennzoil affords little comfort to its view in the context of the present problem.[24] Nor has Pennzoil pointed to any interpretation or other official document generated during the relevant period between the adoption of the property definition and the issuance of the Ruling which supports the differentiation it now relies upon—that this property concept did not apply to units created after 1972. And the affidavits of its advisors were based largely on now discredited ideas that the single property concept did not apply to the unitization of leases at all.

**24.** Both Applications for Exception involved post-1972 unitizations of properties that had been producing as separate entities in 1972. Sun Oil Company based its exception request on the assertion "that the impact of continued price controls will reduce the amount of oil it will be economically feasible to ultimately recover from the field." In reaching the decision to deny this request, the FEA "concluded" that

[s]ince crude oil was produced and sold from 75 different properties in the Norge-Marchand Field in 1972, current crude oil production and sales from any given property must exceed the production from that property in the corresponding month of 1972 (plus any accumulated deficiency) before it can be sold at exempt prices. While the unit operation of the Field will significantly increase the crude oil yield over the life of the Field, the crude oil production in 1975 of each of the properties computed on an individual basis is not expected to exceed 1972 levels and consequently all of the crude oil produced from the 75 properties composing the Norge-Marchand Unit will be subject to FEA ceiling price controls.

No individual "properties" had produced more oil in 1975 than in 1972 and hence under any interpretation of the property definition there would have been no "new" oil in the absence of exception relief.

Although the initial statement by FEA might, in the abstract, tend to support Pennzoil's position in this case we note that this particular "conclusion" was stated more in the form of an initial premise than a holding. Indeed it will be observed that in arriving at its decision, the agency focused on the fact that

... [u]nder the Petroleum Allocation and Price Regulations, an exception may be granted to prevent or alleviate a serious hardship or gross inequity. However, Sun has not even alleged that it or the owners of the Unit will experience a serious hardship or gross inequity in the immediate or near future if its exception request is not grant-

## V. On the Points at Issue There Has Been No "Uncertainty" or "Confusion" To Invoke the Standard Oil Doctrine in Negation of Deference to the Agency Interpretation

Pennzoil and some of the amici curiae contend that *Standard Oil* demonstrates that Ruling 1975–15 cannot be given retroactive effect in view of the "confusion and uncertainty" of the administrative interpretation which, even though it was a reasonable alternative, was not a "compelled" construction.[25]

ed.... Although it may eventually become uneconomic to continue production from the Unit because of ceiling price controls on the sale of such crude oil, that possibility does not constitute a basis for granting exception relief at the present time.

In *Empire*, one of the agency "conclusions" contains language more hospitable to Pennzoil's contentions, but again as in *Sun*, the agency did not rely on that premise in reaching its ultimate decision that "Empire has failed to establish that the application to it of the requirements set forth in 10 C.F.R., Part 212, Subpart D, results in a serious hardship or gross inequity."

On the appeal filed with the Office of Exceptions and Appeals, Empire disputed the determination that it had "failed to demonstrate that its factual situation was so different from that of other firms which had begun secondary recovery operations since 1972 as to warrant an exception from the FEA Mandatory Petroleum Pricing Regulations." The FEA affirmed the earlier decision, again concluding that Empire had failed to make the requisite showing of serious hardship or gross inequity. The agency neither referred to nor relied upon the language tending to support Pennzoil's contentions, thus lending credence to our conclusion that this language did not represent a "holding" of the agency but only a premise not ultimately necessary to the agency decision. The determinative factors of the *Sun* and *Empire* decisions are irrelevant here. *See Massey Motors v. United States*, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960), and discussion thereof in text accompanying note 34 *infra*.

**25.** The contention that even though an interpretation is reasonable it cannot be applied "retroactively" unless "compelled" was urged in Pennzoil's arguments below but has not been reiterated expressly here except by inference or by way of reference. Several of the amici curiae strongly urge it in their briefs filed here.

■ *Standard Oil* is a frequently cited and highly significant decision in the context of its particular circumstances. Where, as on points at issue there, an agency by legislative rulemaking has established no regulatory lodestar and its institutional compass has pointed in opposite or shifting directions, the rule of deference will not sustain the retroactive application of an interpretation of which an affected interest had no fair notice.

However, not only would Pennzoil have us disregard the determinative differences between the circumstances of *Standard Oil* and the case at bar but, as if this were not enough, especially the amici would conjure up from that decision a doctrine of "compelled construction" to replace the rules laid down by the Supreme Court for retroactive applications [26] by the notion that, aside from other circumstances, if there are two reasonable interpretations of a regulation, only the alternative selected by the regulated entity, and not the one selected by the agency, may be given retroactive effect by the courts.[27]

The adoption of any such idea on the theory that *Standard Oil* approved it would not only misread that case but disrupt essential accepted agency functions in favor of self-serving choices of the regulated. Unlike the situation in *Standard Oil*,[28] here there was a regulation in which the very interpretation in dispute was implicit. Far from there being institutional uncertainty and conflict, there existed in official rulings almost a bright line of agency explanation, tentative only on collateral issues but relatively clear and steadfast upon the particular principle in this case.

The legitimacy of the "compelled construction" theory is even less clear than its antecedents. In *State of La. v. Department of Energy*, 507 F.Supp. 1365, 1376 (W.D.La. 1981), the district court ascribed a "compelled construction" doctrine to our decision in *Standard Oil* and to *Standard Oil Co. v. Federal Energy Administration*, 453 F.Supp. 203 (N.D.Ohio 1978), and *Phillips Pet. Co. v. Department of Energy*, 449 F.Supp. 760 (D.Del.1978), the two district court decisions reviewed by us in *Standard Oil*.

> The cases are clear that a *post hoc* agency interpretation of an ambiguous regulation should not be enforced retroactively against a regulated party who adopted and applied an alternate reasonable interpretation of the regulation during the period between the initial promulgation of the ambiguous regulation and the later agency interpretation.

*State of La.*, 507 F.Supp. at 1376. While it is true that both district court decisions on review in *Standard Oil* disallowed retroactive application of the agency interpretation there in question, and that the *Phillips* court concluded that the regulations did not "compel" that agency interpretation, we find no formulation of a "compelled construction" doctrine in either case. *Standard Oil*, 453 F.Supp. at 238–41; *Phillips*, 449 F.Supp. at 780–83, 797–98.

In *Standard Oil*, 596 F.2d at 1052, we observed that the overturned interpretation of the agency "was not compelled." [29] Un-

---

**26.** *See, e.g., Securities Comm'n v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), and later discussion herein concerning retroactivity.

**27.** There of course is a related principle which is respected and sound: if an administrative interpretation is contrary to the plain meaning of the regulation it purports to interpret, the interpretation is not to be retroactively applied, if applied at all. *See, e.g., Tenneco Oil Co. v. Federal Energy Administration*, 613 F.2d 298 (Em.App.1979).

**28.** [I]t is undisputed that during the relevant period the only public pronouncements were made by officials of the Office of Compliance and the FEA auditors and were contrary to the interpretation set forth in the February 1, 1976 rule.
596 F.2d at 1056.
Here the relevant period was between May 1, 1974, when the Walker Creek Field unitization became effective, and August 29, 1975, when the ruling in question was issued. We have already reviewed the situation during this period in contrast with the situation in *Standard Oil*.

**29.** There was confusion and uncertainty among both FEA officials and the refiners. While the regulations could reasonably be interpreted as imposing a NPCI Last sequence of Un-

der circumstances of *Standard Oil* already referred to, this observation was given weight in reaching our conclusion that the interpretation would not be retroactively applied. But a clear indication that such observation was not intended as a discrete rule for the exclusion of retroactive application appears from the fact that we there considered the retroactivity issue at some length separately and upon the basis of the generally accepted tests.[30] Based upon a misconception of those observations for which Pennzoil now contends, the district court in *State of La.*, 507 F.Supp. at 1376, parlayed our passing observations in *Standard Oil* into a cardinal and conclusive retroactive application test. A similar misconception has been relied upon by Pennzoil on the basis of some of our other decisions.[31] As to these, a later decision [32] makes clear that *Standard Oil* was an unusual case and was not intended in the context of such a case as the present one to overturn the usual rules of deference to which agency action is entitled from the courts or the relation back of post-regulation interpretations.[33]

In these circumstances, to deny deference in accepting the agency's interpretation simply because another interpretation, strained or not, was indulged by an operator out of self-interest, would substitute for the rule of deference to agency action a rule of deference to that of a producer.

This would stand the rule of deference literally on its head.

In *Sauder*, 648 F.2d at 1346–47, Sauder had argued "that this court rejects agency interpretations of pre-existing regulations where these interpretations are not 'compelled' by the regulations." Judge Duniway perceptively observed that

[N]either of the cases he relies upon supports this questionable proposition. In *Standard Oil Co. v. DOE*, Em.App., 1978, 596 F.2d 1029, 1052, we found that FEA's interpretation of its regulations as requiring a certain sequence of cost pass-through was reasonable but "was not compelled. The regulations could also reasonably have been construed as imposing no particular sequence of recovery." However, we did not conclude from this fact that the agency's interpretation of the regulations was necessarily invalid. Rather, we concluded only that the validity of the agency's interpretation must be judged separately from the validity of the underlying regulations. Were Sauder correct, the majority opinion would have ended at page 1052 instead of nearly twenty pages later. Moreover, in refusing to defer to the agency's last interpretation of its regulations, we emphasized in *Standard Oil* the extraordinarily confused and contradictory agency interpretations which had preceded it. There

---

recovery, in our opinion this interpretation was not compelled. The regulations could also reasonably have been construed as imposing no particular sequence of recovery. *Standard Oil*, 596 F.2d at 1052.

On three recent occasions, this court has found it necessary to emphasize the limited reach of *Standard Oil* given the unique circumstances of that case. *See Sauder*, 648 F.2d at 1346, (emphasizing that this court did not invalidate the agency's interpretation in *Standard Oil* simply because the underlying regulatory scheme could be construed in more than one way); *UPG, Inc. v. Edwards*, 647 F.2d 147 at 157 nn.24 & 26 (Em.App.1981); *Mountain Fuel Supply Co. v. DOE*, 656 F.2d 690 (Em.App. 1981).

30. 596 F.2d at 1063–65 (discussing the retroactivity tests of *Securities Comm'n v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), and *Retail, Wholesale and*

*Department Store U. v. N.L.R.B.*, 466 F.2d 380, 390 (D.C.Cir.1972)). *See also Phillips*, 449 F.Supp. at 797–98 (applying the same traditional tests rather than basing its decision on any "compelled construction" doctrine). See our discussion *infra* of retroactivity.

31. *Tenneco Oil Co. v. Federal Energy Administration*, 613 F.2d 298 (Em.App.1979); *Longview Refining Co. v. Shore*, 554 F.2d 1006 (Em.App.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977).

32. *UPG*, 647 F.2d at 157.

33. "Interpretative rules simply state what the statute or regulation has always meant in the opinion of the administrative agency issuing the interpretative rule." *Energy Reserves Group, Inc. v. Department of Energy*, 589 F.2d 1082, 1100 (Em.App.1978).

is no comparable history of agency confusion in the case at bar.

Similarly, in *Tenneco Oil Co. v. FEA,* Em.App., 1979, 613 F.2d 298, we refuse [sic] to defer to the agency's interpretation of its regulations, not because the agency's interpretation was merely "reasonable" and "not compelled," but because the agency sought to impose an interpretation "plainly inconsistent with the language of the regulations." *Id.* at 305. In short, the agency's interpretation of the scope of the stripper well exemption and the property concept need not be "compelled" by the regulations in order for us to uphold it. Nor do we see reason on the facts of the case to abandon the normal rule of deference to an agency's reasonable interpretation of its own regulations.

One of the difficulties of analyzing this case has been that in briefs and argument several separate questions have been merged: whether the ruling is interpretative or legislative; the meaning of the regulatory definition; the *Grigsby* holding; the necessity of rulemaking; and the appropriateness of retroactive application. It is essential that we now consider particularly the question of retroactive application as a discrete although related problem.

In view of our conclusions that the critical meaning of the regulatory definition as applied to the issues of this case is implicit in the Ruling, and that the substance of the Ruling (irrespective of the degree of deference applied to the Ruling) represents the correct construction of the regulation, the remaining question is whether the Ruling either as such, or in substance, is entitled to be applied retroactively during the relevant period.

In *Standard Oil,* this court outlined the test for determining the propriety of retroactive application of an agency rule:

We are mindful of the holding of the Supreme Court in *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947), that agency action "might have a retroactive effect [is] not necessarily fatal to its validity. Every

case of first impression has a retroactive effect...." The validity of the agency action depends upon the "balance" between the "mischief of producing a result which is contrary to a statutory design or to legal and equitable principles" and "the ill effect of the retroactive application of a new standard". *Id.* As the court noted in *Retail, Wholesale and Department Store Union v. NLRB,* 151 U.S. App.D.C. 209, 219, 466 F.2d 380, 389, 390 (1972), "[w]hich side of this balance preponderates is in each case a question of law, resolvable by reviewing courts with no overriding obligation of deference to the agency decision ..." The court concluded that among the factors to be considered are "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard". *Id.*

596 F.2d at 1063–64.

■ In the present context, the fundamental criterion is one of reasonableness. "[R]etrospective laws which do not impair the obligation of contracts, or partake of the character of *ex post facto* laws, are not condemned or forbidden by any part of [the Constitution]." *Satterlee v. Matthewson,* 27 (2 Pet.) U.S. 380, 413, 7 L.Ed. 458 (1829). Generally speaking, like retroactive statutes, "retroactive rules are valid if they are reasonable, but are invalid if their retroactivity is unreasonable in the circumstances." *Davis,* § 7:23, at 109. Pursuing the subject, Professor Davis observed that:

Especially instructive is the decision by a divided Court in *Massey Motors v. United States,* 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960), allowing Treasury Regulations to produce retroactive clarifi-

cation of uncertain law, and, in the view of dissenting Justices, to produce retroactive change in a discernible administrative practice. If the Court was right that the previous law was unclear, the basic principle was applicable that retroactive clarification of uncertain law is necessary and involves no unfairness...."

*Id.* at 115.[34]

The interpretation by the Commissioner of Internal Revenue pertained to a Treasury Regulation which in and of itself furnished no clear guide on the point at issue.

It is true, as taxpayers contend and as we have indicated, that the language of the statute and the regulations as we have heretofore traced them may not be precise and unambiguous as to the term "useful life." It may be that the administrative practice with regard thereto may not be pointed to as an example of clarity, and that in some cases the Commissioner has acquiesced in inconsistent holdings.

364 U.S. at 100, 80 S.Ct. at 1416.

They cannot be said to prove conclusively that the Commissioner was following a physically useful-life theory.... The most that can be said is that the element of compromise probably played a predominant role in the result in each case. Moreover, there is no indication in any of these cases that the amount of depreciation would have been changed by computing it on the basis of its useful life in the business. The cases do not seem to reflect considered judgments as to the proper meaning of the terms used in the

depreciation equation and we find them of little value as precedents.

364 U.S. at 103–04, 80 S.Ct. at 1417.

■ Apart from the *Massey Motors* holding under less clear circumstances, the controlling circumstances here is that Ruling 1975–15 is an interpretative ruling, not a legislative change, and simply made explicit what was implicit in the property definition from the beginning.[35]

In *Tenn. Gas Pipeline v. Federal Energy Reg. Com'n*, 606 F.2d 1094, 1110 (D.C.Cir. 1979), Judge Leventhal rejected the notion that an agency's failure expressly to disapprove an industry's view or practice gave it

an affirmative blessing, or—what is the same thing—estops the Commission from now asserting an interpretation contrary to that held by the pipelines.... Further, since the Commission relies on well-established principles of public utility law, it is not sufficient for petitioners to come forward with some conceivable interpretation of language in the advance payment orders that supports their view.

Judge Leventhal distinguished *Standard Oil*, noting that the court there reached "a different result where there existed no previously well-settled rule." *Id.* at n. 55.

■ There is simply no basis in the circumstances of the present case to find unreasonableness, unfairness, or any other element of estoppel in applying the agency interpretation to the relevant period in question here. The Supreme Court has declined to recognize an estoppel against the United States under more appealing facts involving applicants for social security ben-

---

**34.** *Cf. Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978), where the Supreme Court precluded the IRS from retroactively applying a rule requiring employers to withhold certain taxes; during the relevant time, no regulation and no ruling required withholding and no employer could reasonably have suspected that withholding was required.

**35.** Judge Duniway expressed a similar view in *Sauder*, 648 F.2d at 1347.

Closely related to the above argument is Sauder's contention that the agency's insis-

tence on a formal unitization agreement is a retroactive requirement and that it would be inappropriate to apply the requirement to his case under the factors stated in *Retail, Wholesale and Department Store Union v. NLRB*, D.C.Cir., 1972, 466 F.2d 380, 390, and repeated by us in *Standard Oil, supra*, 596 F.2d at 1963–5.

However, we conclude that the agency's interpretation is not retroactive. It does not represent a "departure from well established practice" let alone an "abrupt departure." *Id.*

*See also Energy Reserves*, 589 F.2d at 1100.

efits or citizenship.[36]  Much less would we be inclined to do so on the facts here presented in favor of sophisticated oil field operators exploring the possibility of dubious regulatory leeway without even requesting an official interpretation.

### VI. *Grigsby Is Controlling in Concept and Persuasive in Fact and Our Other Decisions Are Persuasive in Principle*

Since the argument on the motion to dismiss in the district court, Pennzoil has been quite ambivalent with reference to *Grigsby.* During later phases of the proceedings below it was difficult to tell whether it had framed its position in disregard of that decision,[37] was accepting it for whatever it was, or was seeking to overturn it by reason of additional evidence Pennzoil claimed to have discovered in its own case.[38] Before us Pennzoil has accepted *Grigsby*, indeed almost embraced its holding as supportive of its position.[39]

Essentially for the reasons stated by the district court we believe that *Grigsby* dictates the outcome of the present case, by reason of both its authority under the doctrine of *stare decisis* and its concept of the "right to produce."

Disposing of Pennzoil's claim on the basis of *Grigsby*, the district court noted the arguments there made:

> Commencing in October of 1974, Grigsby designated the total production from

---

**36.**  *See Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *Montana v. Kennedy*, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961).

**37.**  The Court: Have you read the *Grigsby* opinion?
   Counsel for Pennzoil: Your Honor, I must say I was aware of the *Grigsby* opinion.  I have not read it.  It was not cited by the Government as being something that I should be aware of for purposes of today's argument and I'm totally astounded that they will take the position that that case forecloses the present case and I doubt seriously that it does.
   Tr. of Arg. on Motion to Dismiss Complaint. R. 0113–14.

**38.**  Counsel for Pennzoil: They [the *Grigsby* panel] had to accept DOE's characterization of what the C.L.C. interpreted for these regulations.  Fortunately, your Honor, you are

the new well as "new oil".  He had two arguments to support this position.  First he asserted that, under the definition of property found in Section 212.72 of the Regulation in 1974, the lease on which the new well was located defined the relevant property.  Second, he argued that, even if the units created under state law defined the relevant property, there had been a new unit created after October 14, 1974 which had a zero base production control level ("BPCL").

514 F.Supp. at 517.

Judge Stapleton correctly observed that our *Grigsby* opinion "made short shrift of Grigsby's first argument" and that we had made plain that the "focus of the property definition is upon the right to produce not the fee or leasehold nature of the ownership interest."  *Id.*

Judge Stapleton observed that the court in *Grigsby* initially summarized and commented upon Grigsby's second argument as follows:

> Grigsby argues that the Robert Leger Well No. 1 [the new well] production could not have been subject to the same "right to produce" as the Lucky Strike Well No. 1 [the original well] production, because the orders of the Louisiana Commissioner of Conservation unitizing the Heywood Sand, Reservoir A, Sand Unit B, from which the Lucky Strike Well No.

---

not in that position.  The evidence that we have produced, if not a different result—and we are not necessarily quarreling with the result in *Grigsby*; we think it may have been right, but not for the reasons that the Court set forth, not because the right to produce per se was controlling, but because the definition was really focusing on 1972, and that the kind of entities that you had there, the accounting entities that existed during that base period were intended at least to be permitted to the producer to utilize as the property so that the system could work [sic].
Tr. of May 11, 1981 hearing, R. 02690–92.

**39.**  Point I of Pennzoil's principal brief that "*Grigsby* Does Not Control the Instant Case but Its Rationale Supports Pennzoil, Not DOE," seems a somewhat forlorn search for blessings in adversity.

1 produced did not and could not include within the unitized area the reservoir from which the Robert Leger Well No. 1 produced.

The premise of Grigsby's argument, that unitization is the source of the "right to produce" and, hence, the unitized premises defines the property, is correct where mineral fee or leasehold interests have been aggregated by unitization. . . .

514 F.Supp. at 518, quoting *Grigsby*, 585 F.2d at 1983.

It was noted that *Grigsby* held that "a new unit, and, accordingly, a 'new right to produce' had been created after 1972 and at least before June 24, 1976," and Judge Stapleton continued:

The recognition that "rights to produce" can be created by unitization orders entered after 1972 is, of course, inconsistent with Pennzoil's argument that Section 212.72 froze "property" boundaries as they existed in 1972. It is true that the *Grigsby* opinion can be read to suggest that the result with respect to the period after June 26, 1976 was dictated, not by Section 212.72 of the Regulations, but rather by Ruling 1975–15 which had become effective in August of 1975. This fact does not aid Pennzoil, however, because the *Grigsby* court held that, de-

pending on what the lower court might find to have been the status of the new well's production under Louisiana law between October 1974 and June 1976, there might have been a new "right to produce" created in 1974.

514 F.Supp. at 518–19.

Pennzoil and various amici curiae argue that the *Grigsby* court declined to decide the "validity" of Ruling 1975–15. Even were this so, in an important sense the position of DOE would be supported, for then the mandate of the property definition itself unaided by interpretation would have been recognized. That is the effect of the court's reasoning in any event. But in the context of the footnote relied upon by Pennzoil the court appears to have been referring to procedural validity which had not been raised in the court below.[40]

While *Grigsby* is persuasive in fact and controlling in concept, many other decisions of this court are confirmatory in principle.[41] Indeed, *Standard Oil* itself, when its different circumstances are factored in, is consistent with the result reached here. Various district court opinions so recognize, with a few exceptions where essentially different situations are involved,[42] or where the basic rationale of *Grigsby* has been ignored.

**40.** *1* "Determination of new, released and stripper well crude oil for units formed prior to the date on which unit BPCL regulations were adopted (February 1, 1976 for enhanced recovery units and September 1, 1976 for all units) are subject to the provisions of FEA Ruling 1975–15 as modified on February 1, 1976." Ruling 1977–2, 42 Fed.Reg. 4409, 4415 (1977). Under Ruling 1975–15, the BPCL, in the case of a pre-1972 unitization, is the total 1972 monthly production from the unit. In the case of a post-1972 unitization, the BPCL is the total 1972 monthly production from all of the leases that now comprise the unit. We intimate no view on the validity of the promulgation of Ruling 1975–15, since the issue was raised for the first time on appeal. *See Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed. 826 (1976).

*Grigsby*, 585 F.2d at 1084 n.*l*.

**41.** *Taunton Municipal Lighting Plant Group, Inc. v. Department of Energy*, 669 F.2d 710 (Em.App.1982); *Wiggins Brothers v. Department of Energy*, 667 F.2d 77 (Em.App.1981)

cert. denied, —— U.S. ——, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *Koch Refining Co. v. U.S. Dept. of Energy*, 658 F.2d 799 (Em.App.1981); *Mountain Fuel Supply Co. v. U.S. Dept. of Energy*, 656 F.2d 690 (Em.App.1981), *supra; Independent Oil v. Department of Energy*, 650 F.2d 1230 (Em.App.1981); *UPG, Inc. v. Edwards*, 647 F.2d 147 (Em.App.1981), *supra; Energy Consumers, Etc. v. Dept. of Energy*, 632 F.2d 129 (Em.App.), *cert. denied*, 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980), *supra; Energy Reserves Group, Inc. v. Department of Energy*, 589 F.2d 1082 (Em.App.1978), *supra; General Crude Oil Co. v. Department of Energy*, 585 F.2d 508 (Em.App.1978), *cert. denied*, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979).

**42.** *See State of La. v. Department of Energy*, 519 F.Supp. 351 (W.D.La.1981), and earlier opinion in same case, 507 F.Supp. 1365, *supra*, which did not question Ruling 1975–15 in its context, but disapproved retroactive application of later rulings of the agency dealing with reservoir-wide production units claimed to be

## VII. Conclusions

Even in the absence of our prior decisions, Ruling 1975–15 would be sustainable as a reasonable interpretation. It is consistent with the language of the property definition. It rationally balanced the objectives of the two-tier pricing structure. The "institutional" interpretation which consistently indicated that a unit of oil leases is a single property is entitled to deference, despite the individual comments and reactions of agency employees which were largely developmental, unofficial and exploratory and which did not bring the case within the *Standard Oil* situation or furnish grounds for any claims of unfair advantage as to Pennzoil or others interested in the Walker Creek Field Unit.

Pennzoil was hardly an innocent abroad interpreting in the midst of confusing babble a direction sign labeled in a foreign language. It was an experienced traveler on familiar terrain perceptively advised by its own counsel in its own interest, and deviating from the plainly indicated direction it had theretofore followed. It knew from the regulations themselves that only an official interpretation by the General Counsel's Office could furnish any assurance for its new course; it chose not to request one.[43]

To the extent other informal advice was relied on, it was obviously wrong in its over-generalization and any more limited rationalization of it is foreclosed by *Grigsby*, the official interpretations as they were issued, and the essential property concept of the regulatory definition itself. Even were Pennzoil to succeed in explaining away *Grigsby*—in erasing the facts and figures of it applicable to this case—the concept of the property definition there expressed would continue to sustain the ruling challenged here.[44]

properties in view of the Louisiana law and the Unit agreements involved there. While the district court applied the "compelled construction" formula now rejected by us as a controlling rule for testing retroactive applicability of interpretations, more significantly it found that the "unit as property" concept applied also to reservoir-described units. We have no such complication in the present case; nor does that case, on the particular merits of which we express no opinion, challenge the concept of the unit's constituting the "property."

**43.** *General Crude*, 585 F.2d at 514 (*see also* appendix to opinion), deals with arguments strikingly similar in several respects to those of the case before us. There the district court had held that an agency decision was inherently arbitrary, not consistent with FEA regulations and directly contrary to the policy objectives of the EPAA. This court reversed. Up to the point General Crude Oil Company established the classification of its oil under review it had applied a different designation (*cf.* Pennzoil's treatment of its Tinsley Field production). Immediately prior to the alteration of its practice, the oil company orally consulted with an IRS agent (then involved in the administration of CLC regulations), such informal consultation apparently being instrumental in the change of practice later challenged by the agency. As in the present case the oil company did not request a formal interpretation from the agency. This court through Judge Estes commented:

Appendix "A" hereto ... shows General Crude's awareness that it could obtain a ruling from the Cost of Living Council on whether the Banning oil production "could be sold as a 'new item' by a 'refiner' .... Gary [the Petroleum Regulations Expert at the IRS Office] said that he thought the theory was tenable, without expressing an opinion as to whether or not it would be sustained by the Cost of Living Council.... He seemed to think that a substantial delay might result if the Company sought to obtain a ruling from the Cost of Living Council prior to making the sale...."

585 F.2d at 514, n.4.

And in rejecting any controlling effect for the informal opinion of the IRS agent and the explanation that an official interpretation would have taken too long to have served the purposes of the oil company, we observed:

Subparts A and B of Part 155 of the CLC Regulations ... contain the procedures to be used for requesting agency interpretations, which do not include oral interpretations. *Id.*

**44.** I am perfectly aware of the fact, he replied.

Then you also know that they summon to their aid visible forms, and discourse about them, though their thoughts are busy not with these forms, but with their originals, and though they discourse not with a view to the particular square and diameter which they draw, but with a view to the absolute square and the absolute diameter, and so on. For while they employ by way of images those figures and diagrams aforesaid, which again have their shadows and images in water, they are really endeavouring to behold

The judgment of the district court dismissing plaintiff's claims is affirmed and the case is remanded for consideration of the counterclaim of the United States.

IT IS SO ORDERED.

JAMESON, Judge, concurring.

I concur in the holding and generally in Judge Christensen's opinion, although in my opinion the uncertain and confusing interpretations of § 212.72 by the DOE prior to the adoption of Rule 1975–15 raise a close question with respect to the retroactive application of the Rule under our holding in *Standard Oil Company v. DOE*, 596 F.2d 1029 (Em.App.1978). I conclude, however, that Pennzoil's own conduct, including its failure to secure a timely, official agency interpretation of § 212.72 and its inconsistent treatment of its production from the Tinsley and Walker Creek fields, precludes its recovery in this action.

I agree with the analysis of *Standard Oil, supra,* as set forth in the majority opinion and in *Sauder v. DOE*, 648 F.2d 1341 (Em. App.1981), and particularly that there is no merit in the contention that even though the DOE's interpretation is reasonable, it cannot be applied retroactively unless it is "compelled". We concluded in *Standard Oil* that the regulations were ambiguous; that there was confusion and uncertainty among both FEA officials and the refiners; that the DOE's interpretation was not "contemporaneous" with the relevant period; and

that while the FEA's rule was a reasonable interpretation it was not "compelled". Accordingly it was then necessary to determine whether the subsequent rulemaking procedures could be given retroactive effect "under the factual situation [there] presented".[1] The same determination must be made here.

It is true that some of the agency's interpretations of § 212.72 support the 1975 ruling and the interpretation found implicit in the court's opinion. Most significant is a formal agency interpretation issued by the General Counsel of the FEA expressly supporting an "aggregate treatment" interpretation of § 212.72.[2] The other four interpretations cited in the opinion, n. 11 *supra,* deal with units formed before 1972, however, and for that reason are of limited value with respect to post 1972 unitization.[3]

On the other hand, the OEA issued two decisions in March and May of 1975 which give the strong if not compelling impression that "aggregate treatment" would not be allowed under § 212.72. *Sun. Oil Co., supra,* clearly contemplates computation of production on an individual property basis.[4] *Empire Drilling Co., supra,* expressly requires individual treatment.[5] Although exception relief was denied in each case because of the applicants' failure to prove gross inequity or serious hardship, the text of those decisions would, in my opinion, reasonably lead a producer to believe that

those abstractions which a person can only see with the eye of thought.
*Plato, The Republic* 233 (J. Davies & D. Vaughan trans. 1895).

1. It was undisputed in *Standard Oil* that "during the relevant period the only public pronouncements were made by officials of the Office of Compliance and the FEA auditors and were contrary to the interpretation set forth in" the rule in question. 596 F.2d at 1056.

2. Interpretation No. 1975–4, issued Feb. 14, 1975; later published at 42 Fed.Reg. 23726 (May 18, 1977).

3. Although issued to different companies (but not to Pennzoil) in 1974 and early 1975, none of these Interpretations was published in the Federal Register until March, 1977.

4. "Since crude oil was produced and sold from 75 different properties in the ... Field in 1972, current crude oil production and sales from any given property must exceed the production from that property in the corresponding month of 1972 .... before it can be sold at exempt prices." *Sun Oil Co.,* 2 FEA ¶ 83,075, (Mar. 21, 1975).

5. "Under the provisions of 10 C.F.R., part 212, Subpart D, all current crude oil production and sales from each of the nine Danberry Unit properties which does not exceed the production from that property in the corresponding month of 1972 ... is subject to the ceiling prices established under 10 C.F.R., 212.73" *Empire Drilling Co.,* 2 FEA ¶ 83,142 (May 9, 1975), aff'd 2 FEA ¶ 80,876 (Sept. 2, 1975).

the DOE interpreted § 212.72 to require computation of a unit's production on a property by property basis.

Pennzoil also presented evidence that it was advised by FEO officials in Houston, Texas, that for units formed after 1972, certification as to new and released oil would continue to be conducted on an individual property basis. Pltf. Ex. 70; Pltf. Ex. 150. That advice was apparently confirmed shortly thereafter by James Langdon, then Director of the Office of Regulatory Review of the FEO. Def. Ex. 41. There is also evidence that Langdon gave similar advice to other producers. Affidavit of Ben C. Newman (R. 1416–17). In addition, on February 12, 1975 Langdon presented a paper at an Oil and Gas Institute in which he stated that a "property by property" treatment was a possible interpretation of § 212.72. Pltf. Ex. 115.

On December 30, 1974, the National Office of Compliance and Enforcement of the FEA distributed a manual to be used in agency investigations which expressly allowed producers the option of applying the regulations on a lease-by-lease basis even in a unitized field. Pltf. Ex. 109–A.

Affidavits of former DOE officers, now affiliated with oil companies, state that Ruling 1975–15 is inconsistent with the original agency interpretation of § 212.72. Although the recollections of agency staff are not entitled to great weight in construing statutes or divining the meaning of a regulation, they may be considered where, as here, "the reviewing court does not have the benefit of a detailed administrative record developed in the course of normal rulemaking procedures." *Nader v. Sawhill*, 514 F.2d 1064, 1067 n. 6 (Em.App.1975); *Standard Oil*, 596 F.2d at 1045, 1053–54; *Getty Oil Co. v. DOE*, 581 F.2d 838 (Em.App.1978), *cert. denied*, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); *Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council*, 481 F.2d 1388, 1390 (Em.App.1973).

The contemporaneous construction of § 212.72, as revealed in these official interpretations, OEA decisions, agency forms and manuals, informal telephonic communications, papers presented to industrial conferences, affidavits of former agency personnel, and post-1975 regulatory changes does not, in my opinion provide "almost a bright line of agency explanation . . . upon the particular principle in this case." In fact, the DOE appears to have made little effort to insure that the industry was receiving a clear and consistent interpretation of § 212.72.

As in *Standard Oil*, the regulations here were ambiguous and there was uncertainty and confusion among both the DOE and the producers with respect to their interpretation. I cannot find, however, that *Pennzoil* was entitled to rely upon the interpretation for which it contends. In *Standard Oil*, the only public pronouncements by DOE officials during the relevant period were contrary to the interpretation for which the DOE sought retroactive application. (See n. 1) Here Pennzoil was fully aware of the uncertainty, confusion, and different interpretations but made no reasonable effort to obtain a ruling from the General Counsel of the DOE.

A lawyer of Pennzoil was advised by another attorney by letter dated July 12, 1974 (Pltf. Ex. 71), not long after the establishment of the Walker Creek Field, that the "problem had been raised previously and is currently under consideration by the General Counsel's Office. . . ." As Judge Christensen noted, this seems both an invitation to seek advice and a warning that if it did not do so it was proceeding at its own peril. N. 15, *supra*. On June 14, 1974, Pennzoil had written to Cities Service Oil Company, regarding pricing of oil from the Walker Creek unit, in which it stated that it "expect[ed] a ruling from the Federal Energy Office in the reasonably near future. . . ." Yet there is no evidence that this ruling was ever requested or received by Pennzoil.

Whether the result of negligence or an intentional decision, Pennzoil knowingly proceeded at its own peril when it relied on the conflicting informal opinions it received as to the proper interpretation of § 212.72.

For that reason I concur in the court's decision.[6]

**6.** I do not believe that *Grigsby* dictates the outcome of the present case. Its concept of "right to produce" does not answer the question presented here, and the two cases are factually distinguishable. Moreover, the *Grigsby* court expressly declined to consider the issue of the validity of the promulgation of Ruling 1975–15. 585 F.2d at 1084 n.*l.*