FRANCIS OIL AND GAS, INC., Curtis S. Green, Dave R. Sylvan, George D. Daly, George B. Kaiser, and Don H. Nelson, individually, and on behalf of all other persons similarly situated, collectively, and as a class, Plaintiffs-Appellees,

v.

EXXON CORPORATION and Marathon Oil Company, individually and on behalf of all other persons similarly situated, collectively, and as a class, Defendants-Appellants.

No. 5–73. ·

Temporary Emergency Court of Appeals.

Argued June 28, 1982.

Decided Aug. 16, 1982.

Certiorari Denied Nov. 8, 1982.

See 103 S.Ct. 365.

David J. Beck, Fulbright & Jaworski, Houston, Tex., with whom David L. Tolin, Houston, Tex., of the same firm; James R. Stevens, Robert J. Pickins, Houston, Tex. and William B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, Tex., were on the brief, for defendants-appellants.

Frederic Dorwart, Holliman, Langholz, Runnels & Dorwart, Tulsa, Okl., was on the brief, for plaintiffs-appellees.

Before INGRAHAM, ESTES and POINTER, Judges.

INGRAHAM, Judge:

This dispute arises out of the unitized oil and gas operations in the Yates Field in Pecos and Crockett Counties, Texas. Francis Oil & Gas, Inc., and various individuals (hereinafter "appellees") sought a declaratory judgment from the district court that

the unit agreements governing the Yates Field Unit "did not effect a reallocation and cross-conveyance of the rights to and benefits of stripper well pricing and therefore left the rights to and benefits of stripper well pricing in the owner of the oil and gas rights in respect of the tract from which the oil is produced." On cross-motions for summary judgment, the district court entered summary judgment granting appellees' request. Exxon Corporation and Marathon Oil Company (hereafter "appellants") appeal. We find that the declaration requested by appellees was, to say the least, inaccurate and misleading, and accordingly the declaratory judgment should have been denied. We therefore reverse and remand with instructions to enter summary judgment on appellants' motion.

### I—BACKGROUND

"Stripper" wells are generally defined as wells that produce such a small volume of oil that the income derived provides only a small margin of profit, or none at all. See 8 Williams & Myers, Oil and Gas Law 729 (1981). For federal energy regulatory purposes a stripper well is one that produces ten barrels a day or less. See, e.g., 10 C.F.R. § 212.54 (1977). In 1973, at the outset of petroleum price controls, Congress noted that stripper wells accounted for 71% of the total number of wells in the country but only 13% of the total domestic crude production. Conf.Rep.924, 93d Cong., 2d Sess., reprinted in 1973 U.S.Code Cong. & Ad.News 2417, 2523, 2532 (Joint Statement of the Committee of Conference on the Trans-Alaska Pipeline Authorization Act of 1973, P.L. 93–153).

Congress desired to provide an incentive for producers to maintain these known sources of domestic crude oil and keep them in production longer than would ordinarily be economically feasible. Id. Accordingly,

oil produced from stripper well properties enjoyed a preferred status throughout the history of price controls. We have retraced the treatment of stripper well oil in detail in other contexts, see, e.g., Sauder v. Department of Energy, 648 F.2d 1341, 1342–43 (Em.App.1981); Energy Reserves Group, Inc. v. Department of Energy, 589 F.2d 1082, 1087–91 (Em.App.1978). For present purposes it is sufficient to recapitulate that stripper well oil was either entirely exempt from price control, see, e.g., Emergency Petroleum Allocation Act of 1973, § 4(e)(2)(A), Pub.L.93–159, 87 Stat. 627, 632 (1973), or placed in the "upper tier,"[1] 41 Fed.Reg. 4931, 4940 (Feb. 3, 1976) (codified at 10 C.F.R. § 212.74(a)), from 1973 until the expiration of petroleum price controls in January 1981. Exec.Order No. 12287, 3 C.F.R. 124 (1982).

On February 3, 1976, the Federal Energy Administration (predecessor to the Department of Energy) promulgated Section 212.-75(e), 41 Fed.Reg. 4931, 4941 (Feb. 3, 1976), to deal specifically with the problem of inclusion of stripper wells in units such as the Yates Field Unit. Unitization agreements combine the separate tracts in a field so that the field may be operated as a single tract without regard to surface property lines. Unitary operation is particularly appropriate where the reservoir has passed its primary production phase and secondary, "enhanced" recovery operations, for example, converting some wells to injection wells and shutting in others, are required to prolong and increase production. See generally Sauder v. Department of Energy, 648 F.2d 1341, 1342 (Em.App.1981). As the FEA explained, "prior regulations might have discouraged producers of stripper well leases from entering unitization agreements because of the potential loss of the property's uncontrolled (now upper tier) status." 41 Fed.Reg. at 4937. The FEA explained

---

1. As Judge Christensen recently explained in *Pennzoil Co. v. Dept. of Energy*, 680 F.2d 156 (Em.App.), *petition for cert. filed*, 50 U.S.L.W. 3998.20 (June 18, 1982), the federal price control regulations set up a two-tier system to determine the ceiling price for crude oil. The quantity of oil produced in a historical base period was labeled the "base production control level" (BPCL); any current production at or below the BPCL was "old oil" and was priced at the lower tier ceiling; production above the BPCL was "new" oil and could be sold at the upper tier ceiling. For a detailed description of the two-tier system, see the cases collected in *Pennzoil, supra*, at 161.

that this loss would occur if the increased production resulting from unitization caused the previously-qualified stripper wells' allocation of crude oil to exceed ten barrels per day. In order to remove this disincentive to unitization, the FEA devised an exemption, subsequently labeled the "imputed stripper well exemption," see 41 Fed.Reg. 48319, 48320 (Nov. 3, 1976) (codified at 10 C.F.R. § 212.75(f)), permitting units to recognize and continue to benefit from the pre-unitization stripper well status of individual tracts. This case requires us to unravel the imputed stripper well exemption for the Yates Field Unit.

Appellees own working interests in Tract 117 in the Yates Field. Prior to July 1, 1976, this property qualified for stripper well treatment and appellees sold forty barrels of crude oil per day from the property at stripper well prices. On July 1, 1976, the Yates Field Unit Agreements became effective and a unit-wide BPCL was calculated. From July 1976 to September 1980, appellees were under contract to sell their share of the Yates Field production to appellant Exxon Corporation. In their certifications[2] to Exxon classifying the production as old, new or stripper oil, appellees continued to count forty barrels per day at the higher stripper well prices. Exxon, however, calculated appellees' share of the imputed stripper well exemption based on information provided by the Unit Operator, appellant Marathon Oil Company; specifically, Exxon applied the "tract participation" allocation formula provided in the unit agreements, thus crediting appellees with a share of the unit's imputed stripper well exemption proportional to the size and historic production of their tract. This share of the imputed stripper well exemption was less than forty barrels per day. Exxon's pay-

ments to appellees, accordingly, were lower than the certified amounts, at least with respect to stripper oil.

Appellees brought suit in a Texas state court for a declaratory judgment that they were entitled to sell forty barrels of crude oil per day at stripper prices.[3] Appellants removed the case to the United States District Court for the Western District of Texas. After discovery, briefing and oral argument the district court entered summary judgment (and shortly thereafter an "amended summary judgment") for appellees. The district court adopted appellees' theory that the unit agreements allocate only production and not proceeds (or "pricing benefits"). The underlying question, the district court stated, was the legal status of the stripper wells after unitization. The court concluded, after examining the regulations, that once an individual property qualified for stripper well status it retained that status despite subsequent unitization, and that the "pricing benefits of stripper oil were not unitized and thus were not imputed to the remainder of the interest owners in the unit." Consequently, the court believed that the imputed stripper exemption "does not indicate . . . that stripper oil is automatically imputed to other interest owners if and when the stripper tract unitizes with non-stripper tracts." Because the appellees had done nothing to voluntarily contribute any of their "pricing benefits" to the unit, according to the court, they were still entitled to claim the full pre-unitization forty barrels per day.

## II—APPELLATE JURISDICTION

■ At the outset appellees argue that this appeal does not fall within the limited statutory jurisdiction of this court. We disagree. Section 211(b)(2) of the Economic

---

**2.** Every producer was required by 10 C.F.R. § 212.131 to certify to purchasers the amounts of new, old and stripper oil it was producing for sale, as well as other information. Although appellees have made comments in their brief and during oral argument complaining that Exxon's failure to pay according to their certifications is itself a violation of the applicable regulations, no certification-related question has been litigated or properly raised on appeal

in this case and we venture no opinion in that area.

**3.** Three related suits were filed in federal and state courts in Oklahoma and Texas. The latest development appears to be *Francis Oil & Gas, Inc. v. Exxon*, 661 F.2d 873 (10th Cir. 1981), in which the Tenth Circuit reversed the dismissal of one of Francis' Oklahoma suits for failure to join indispensable parties.

Stabilization Act of 1970 granted TECA "exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations for orders issued thereunder." 12 U.S.C. § 1904 note (Supp. 1977). This provision was incorporated in section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1) (1976), which extends TECA jurisdiction to appeals "arising under" the petroleum pricing and allocation regulations. While it is true that TECA has no jurisdiction to consider purely private contract law claims, see *Atlantic Richfield Co. v. Department of Energy*, 655 F.2d 227, 233 (Em.App.1981), a damage claim "in the breach of contract sense" that alleges entitlement to a specific price based upon the federal price regulations clearly falls within TECA's jurisdiction. *Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375, 1381 (10th Cir. 1978), cert. denied, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1058 (1979). We have articulated two principal inquiries: whether resolution of the litigation in its entirety requires the application or interpretation of the Emergency Petroleum Allocation Act and implementing regulations, *Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corp.*, 591 F.2d 711, 716 (Em.App.), cert. denied, 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979); and whether an EPAA issue has been adjudicated in the court below. *Texaco, Inc. v. Department of Energy*, 616 F.2d 1193, 1198 (TECA 1979).[4]

■ In light of these standards our jurisdiction in this case is unmistakable. Appellees claim they are entitled to favorable treatment under a specific federal regulatory provision, the stripper well exemption. Their entitlement to this price or any other, during the period in question, was entirely governed by the federal price control regulations. Appellees candidly represented this reliance on the regulations in, among other places, their Brief in Support of the Named Plaintiffs' Motion for Class Action Certifi-

cation. This document states that "the case does involve certain pricing rights and benefits which, although allocated by private agreement, are set by federal law," and that there was a "crucial relationship between the (unit agreements) and the federal regulations . . . ." Not only does the claim here rest almost entirely upon the federal regulations, as in *Mountain Fuel Supply, supra*, but it is evident that this dispute can be resolved only through an interpretation of the regulations and that such an interpretation will control the litigation. *Citronelle-Mobile Gathering, supra*, 591 F.2d at 716.

Moreover, as even our brief quotations from the district court's decision indicate, that decision rests significantly on the court's analysis of the federal regulations. The ruling that the imputed stripper well exemption and other regulations did not automatically impute stripper well oil to all interest owners in a unit, for example, is crucial to the court's conclusion that pre-unitization stripper well properties retain their full exemptions upon unitization. An EPAA issue was thereby adjudicated, and TECA is the only court with jurisdiction to review the decision.

III—THE IMPUTED STRIPPER WELL EXEMPTION AND THE YATES FIELD

■ Appellees strenuously argue that this case hinges on an interpretation of the unit agreements, as a matter of state law, and that the federal regulations are "neutral" regarding the outcome. As the preceding discussion of jurisdiction may suggest, however, we believe a relatively straightforward analysis of the federal regulations resolves the case, and that the appellees misapprehend the sense in which the regulations are "neutral."

We begin with the definition of "property." As the Federal Energy Administration observed, "the property concept lies at the heart of the crude oil regulatory scheme."

---

4. *See also United States v. Uni Oil, Inc.*, 646 F.2d 946, 949 (5th Cir. 1981), cert. denied, 455 U.S. 908, 102 S.Ct. 1254, 71 L.Ed.2d 446 (1982) (observing that "if the district court ad-judicated an EPAA issue, we lack jurisdiction"); *Coastal States Marketing, Inc. v. New England Petroleum Corp.*, 604 F.2d 179 (2d Cir. 1979).

41 Fed.Reg. 4931, 4938 (Feb. 3, 1976).[5] The stripper well exemption itself applied only to a "property" that produced ten barrels per day per well or less. *See* 10 C.F.R. § 210.32 (1976).[6] Section 210.32 further provided as follows:

"Property" is the right that arises from a lease in existence in 1972 or from a fee interest to produce crude oil in existence in 1972 and is coextensive with the term "property" used in § 212.72 for purposes of determining "base production control level crude oil."

*Id.* In Ruling 1975–15, the FEA analyzed the definition of property in the context of unitizations. Emphasizing that "the property concept is one that identifies the *right to produce crude oil* " (emphasis in original), and noting that unitization converts production into a single operation, the Ruling concluded that for post-1972 unitizations, "the property consists of the unit, and the BPCL is the total 1972 monthly production from all of the several leases that now comprise the unit." 40 Fed.Reg. 4832 (Sept. 4, 1975). We upheld these interpretations in *Pennzoil Co. v. United States*, 680 F.2d 156 (TECA), *petition for certiorari filed*, 50 U.S.L.W. 3998.20 (June 18, 1982), and *Grigsby v. Dept. of Energy*, 585 F.2d 1069, 1083–84 (Em.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979). The principle that a unitized property is a "single property" for regulatory purposes, *Pennzoil* states, is implicit in the property definition itself. 680 F.2d 156 at 167–168. *See also Sauder v. Dept. of Energy*, 648 F.2d 1341, 1343 (Em.App.1981); Ruling 1977–2, 42 Fed.Reg. 4409, 4414–15 (Jan. 25, 1977).

In February 1976, the FEA promulgated section 212.75. 41 Fed.Reg. 4931, 4941 (Feb. 3, 1976). Section 212.75(a) required producers to calculate a "unit base production control level" at the date of implementation of enhanced recovery operations or when the production patterns within the unit were substantially altered. 41 Fed.Reg. at 4941. This provision was simplified in August 1976 to require that "with respect to each unitized property, a producer shall, as of the effective date of unitization, establish a *unit* base production control level." 41 Fed.Reg. 36171, 36184 (Aug. 26, 1976) (emphasis added). This language simply makes explicit and concrete the prevailing view that a unit forms a single property for purposes of calculating the various regulatory classifications in the federal petroleum pricing scheme.

The provision of most importance to us, the imputed stripper well exemption, was contained in section 212.75(e). This section provided that a producer of crude oil from a unitized property could sell at upper tier prices "a number of barrels equal to the total number of barrels of crude oil produced from each stripper well lease that constitute the unit during the twelve month period immediately preceding the establishment of a unit base production control level, divided by twelve." 41 Fed.Reg. at 4941. The label "imputed stripper well crude oil" was first applied in a November 1976 amendment, which also renumbered the exemption. 41 Fed.Reg. 48319, 48324 (Nov. 3, 1976) (codifying 10 C.F.R. § 212.75(f)).

The plain language of section 212.75 would seem to make clear that a property qualified as a "stripper well lease" prior to unitization would cease to qualify as a sepa-

---

**5.** This comment appears in the preamble to 10 C.F.R. § 212.75(e), the first imputed stripper well crude oil exemption. Preambles have considerable explanatory value and we consider them, throughout this discussion, in construing the regulations. *See Wiggins Bros. v. Dept. of Energy*, 667 F.2d 77, 88–89 (TECA 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982).

**6.** The regulations continuously spoke in terms of "property" despite the various amendments applicable to stripper wells. During the first

"exempt" period, from 1973 to February 1976, the definition was contained in 10 C.F.R. § 210.32 and its predecessor, 6 C.F.R. § 150.-54(s)(2) (1974). When stripper well crude was moved from exempt into the upper tier from February to September 1976, the applicable section was 10 C.F.R. § 212.72, 41 Fed.Reg. 4931, 4940 (Feb. 3, 1976). In November 1976, the exemption was reinstated, effective September 1, and the definition codified at 10 C.F.R. § 212.54, 41 Fed.Reg. 48319, 48323 (Nov. 3, 1976).

rate property, with a separate exemption, upon unitization; however, the unit would still be able to recognize and benefit from the historical stripper well status of some of its constituent parts through the imputed stripper well exemption. If that conclusion was not sufficiently clear from the text of the regulation itself, the preamble removed any further doubt. We have already referred to the preamble in the preceding discussion but a more detailed quotation is appropriate here:

### B. PRODUCTION AND SALE OF UPPER TIER CRUDE OIL FROM UNITIZED PROPERTIES

*Stripper Well Leases.* FEA has determined that prior regulations might have tended to discourage producers of stripper well leases from entering unitization agreements because of the potential loss of the property's uncontrolled (now upper tier) status. For example, if a stripper well lease is unitized with other, non-stripper well leases, the resultant production rate (when the unit production is averaged over the total number of wells in the unit) might exceed 10 barrels per well per day. The producer might be reluctant to enter the unit in that event unless his share of crude oil production were to be increased significantly.

FEA, therefore, proposed an amendment to the regulations in this regard which provides that when a *previously-qualified* stripper well lease has been unitized with other properties (some or all of which are non-stripper well leases), the stripper well lease is *deemed to contribute to the unit* an amount of upper tier crude oil equal to its average daily production of crude oil, excluding condensate recovered in non-associated production, calculated over the twelve month period immediately preceding unitization. For example, if a stripper well lease with five wells had been producing a total of 38 barrels of crude oil per day (averaged over the preceding twelve month period), the same quantity of crude oil would retain its upper tier status when produced from the unit. Therefore, after unitization, 38 barrels per day of crude oil produced from the unit would continue to be classified as upper tier crude oil and could be sold at the upper tier ceiling price, without regard to whether the unit, as a whole, was producing in excess of its BPCL. Such upper tier crude oil deemed to have been produced from a stripper well lease would be in addition to any upper tier crude oil resulting from production in excess of the unit's BPCL.

41 Fed.Reg. at 4937 (emphasis added). This language makes clear that the previously-qualified stripper well leases retain significance only for purposes of calculating the quantity of imputed stripper oil these leases contributed to the unit.

In light of *Pennzoil, Grigsby* and the specific provisions of section 212.75 relating to calculation of a unit BPCL, there can be no serious question that the Yates Field was a single property for regulatory purposes and that the quantities of oil falling into the "old," "new" and "stripper" categories had to be calculated on the basis of the unit as a whole. It is inconsistent with this principle for individual tract owners such as appellees to assert calculations based on their pre-unitization behavior as if unitization had never occurred. More importantly, the appellees lost the ability to claim, unilaterally, a stripper well crude oil exemption when their pre-unitization "property" became part of the unit.[7] Appellees put considerable emphasis on the fact that they took their allocation of oil "in kind," pursuant to the unit agreements, and argue that once they had possession of the oil they could sell it as they pleased. This argument completely overlooks the principle that because this oil resulted from a unitized operation it carried with it regulatory classifications computed on the basis of the unit's

---

7. Appellants point out another anomaly in appellees' argument; if it is true that pre-unitization tracts retained the ability to claim, on their individual behalf, a stripper well exemption, then *all* the oil produced from Tract 117 would be eligible for stripper pricing; however, appellees only asked for forty barrels per day, although their allocation was over one hundred barrels. Thus, it is difficult to perceive the theory on which appellees made their claim.

**490**

production as a whole. Simply taking the oil in kind did not allow appellees to revert to pre-unitization pricing, any more than it would allow appellees to ignore price controls altogether.

Appellees also argue that if joining a unit means an individual tract's stripper well exemption is automatically imputed to the unit as a whole, which is our holding in this case, then they were forced to "give up" something that no other individual tract owner "gave up" upon joining the unit. Whether this is true as a factual matter is far from clear. In any event we believe that result is mandated by operation of the regulations outlined above, particularly because of the shift from individual to unit "property" upon which the exemption is based, and the preamble language indicating that the individual lease *contributes to the unit* a volume of stripper well oil. Although appellees do not phrase their argument in constitutional terms, the complaint that they were unfairly deprived of a preferential pricing classification is reminiscent of similar arguments we rejected in *Mapco, Inc. v. Carter*, 573 F.2d 1268 (Em.App.), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978), and *California v. Simon*, 504 F.2d 430, 437 (Em.App.) ("On no theory did appellees have a vested right to a continuation of the preferential treatment"), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974). As we have seen, the imputed stripper well exemption in fact was an attempt by the federal agency to prevent the total loss of credit for production from previously marginal properties. This does lead, however, to the question that ultimately separates the parties in this case; how should the unit's imputed stripper well exemption be allocated among the participants?

It is in this respect that the federal regulations were intended to be neutral. The preamble to section 212.75, immediately following the description of the imputed stripper well exemption, states:

Although some comments suggested that FEA prescribe the method for allocating this quantity of upper tier crude oil among the participating leases, FEA has determined that this allocation [is] more properly a matter for private resolution among participants of the unit agreement.

41 Fed.Reg. at 4937. What FEA envisioned is readily apparent: preserving the possibility of a stripper well exemption would remove any disincentive to unitization on the part of owners of stripper well properties; and these owners could use the prospect of an *imputed* exemption as a *bargaining chip* to negotiate favorable terms in the unit agreement. Ironically, the district court's ruling (based on its interpretation of the regulations) that only the pre-unitization stripper well property owners retained the imputed exemption was itself an allocation to particular participants; a decision the FEA stated was to be left to private resolution.

Appellant Exxon's exact calculations are not before us and we do not review their mathematical accuracy. However, appellees' insistence that the imputed stripper well exemption was a non-unitized "pricing benefit," and the district court's apparent adoption of that theory, requires a clarification from this court. The imputed stripper well exemption consistently spoke in terms of a number of barrels of oil, an actual volume of production. *See, e.g.*, 10 C.F.R. § 212.75(f) (1977). This classification of production was identical, in that respect, to upper and lower-tier oil under the two-tier price control scheme. The unit agreements specify a formula for allocating the unit's production on the basis of "tract participation." Appellees admit that this formula controlled the allocation of upper and lower-tier oil. Imputed stripper well crude oil, therefore, should have been allocated in the same manner.[8]

**8.** We do not suggest that the allocation of imputed stripper well oil must inexorably follow the same formula as allocation of upper and lower tier oil: the allocation of various categories of production, we emphasize, was within the control of the contracting parties. The Yates Field Unit Agreements, however, were drafted before section 212.75 was adopted and

IV—Conclusion

The district court's award of summary judgment to plaintiffs-appellees is reversed, and the case is remanded for entry of an order dismissing this cause on the cross-motion for summary judgment by defendants-appellants.

Reversed and Remanded.

therefore contained no provision specifically referring to the imputed stripper well exemption. The only provision available, the parties both inform us, allocates all categories proportionately according to tract participation. We hold only that imputed stripper well oil is indistinguishable from other categories such as "old" and "new" oil; accordingly, if a provision for allocating oil exists it must be applied to imputed stripper well oil in the same manner as the other categories, absent express contractual provisions specifying an alternative allocation.